408 So.2d 275 (1981)
June M. OLIVER, Individually and on behalf of her son, Griffith Oliver, and Blue Cross
v.
PARISH OF JEFFERSON, Louisiana Department of Highways and their Insurer, XYZ Insurance Company.
No. 5-15.
Court of Appeal of Louisiana, Fourth Circuit.
November 12, 1981.
Rehearing Denied January 21, 1982.
*276 Gertler & Gertler, Donald M. Pierce, David Gertler, New Orleans, for June M. Oliver, plaintiff-appellee.
Philip K. Jones, Norman L. Sisson, Marshall W. Wroten, Jesse S. Guillot, New Orleans, for Louisiana Dept. of Transp. and Development, defendant-appellant.
Before BOUTALL, CHEHARDY and KLIEBERT, JJ.
CHEHARDY, Judge.
Defendant Louisiana Department of Transportation and Development (formerly Louisiana Department of Highways) appeals a district court judgment in favor of the plaintiff June M. Oliver, individually and on behalf of her son, Griffith Oliver, and against the defendant in the sum of $1,301,592 together with legal interest from date of judicial demand and all costs of the proceedings. The plaintiff has answered the appeal asking for an increase in the quantum of damages awarded by the district court.
In his written reasons for judgment, the district court judge very explicitly set out all of his findings of fact and conclusions of law:
"On January 13, 1976, Griffith Oliver (then aged 25) was severely injured when he failed to negotiate a curve on the overpass located at Causeway Boulevard and Jefferson Highway in Jefferson Parish. As a result of the accident, Oliver is permanently disabled both physically and mentally and is presently confined to a convalescent home in the State of Connecticut.
"Plaintiff contends that the overpass in question was negligently designed in that the overpass has a drastic curve to the right with insufficient space in which to negotiate a turn; and, that this drastic angle is undiscernable to an approaching motorist at night. Further, that the Department of Highways, with full knowledge that the overpass was dangerous, failed to provide adequate signs and/or warning devices commensurate with the danger involved.
"The Department of Highways contends that the overpass was reasonably safe for persons exercising ordinary care and reasonable prudence. Further, the Department contends that this accident was caused by the negligence of Oliver in that he was operating his vehicle at an excessive rate of speed combined with the fact that he had been drinking that evening.
"Originally from the State of Connecticut, Oliver moved to Jefferson Parish approximately two (2) years before the accident. There is no evidence of his traversing this particular overpass prior to the accident date. Oliver was employed as a salesman in the New Orleans area and had enrolled at the University of New Orleans to study engineering on January 13, 1976.
"There were three (3) passengers in the automobile at the time of the accident. One of the passengers was in New Orleans for the purpose of taking over Oliver's job since he was now returning to school on a full-time basis. Oliver and his three friends had dinner that evening, traveled to the French Quarter, and were returning home at the time of the accident. *277 The deposition of Mark Rukavina, a passenger, reflects that they each had a drink before dinner, one after dinner and one drink at Pat O'Brien's. Although the police officer estimates the speed at fifty (50) miles per hour, Mark Rukavina, when question about the speed, said:
`I think it would have been a normal speed for the situation. I think it would have been around thirty miles an hour. I can't say for sure, I didn't see the speedometer, but there was nothing unusual about the approach to that turn as far as I was concerned.'
"Doctor Fosberg, an expert in industrial psychology, testified for the plaintiff. He explained the visual problems that Oliver encountered in going from the well-lighted Causeway to the overpass where the lights were out. He concluded that the signs erected at the time of the accident were insufficient to indicate to Oliver that he was in a dangerous situation.
"James Fister, a registered civil engineer, also testified for the plaintiff. He has experience in roadway design and traffic engineering both in the State of Louisiana and Georgia. His opinion was that this overpass did not meet the standards set forth by the American Association of State Highway Officials as set forth in 1954, the date this overpass was constructed. His opinion was whether this overpass be considered as a regular roadway or a turning roadway, the AASHO standards were not met. For example, the degree of curvature allowed for a regular roadway would be twenty-four degrees, whereas the degree of curvature on this roadway is forty-three degrees. And, if considered as a ramp or turning roadway, a 150 foot radius is the minimum and this overpass had a 131 foot radius.
"This Court has reviewed the photographs of the warning signs. It is important to note that the large overhead sign (Sign # 4) shown in the photograph identified as P-12 is only a directional sign. There is absolutely no warning of the dangerous curve which lies ahead. The warning sign (Sign # 7) is clearly deficient because it is not prominent enough and fails to communicate the real danger to the driver.
"There have been numerous accidents at this site which should have caused the State to make a thorough study of this overpass. Such a study would have indicated the need for better illumination and the need for larger and more prominent warning signs.
"This accident occurred in the early morning hours on a foggy night in January. The lights were out on the ramp and the only visual clue of this dangerous curve was the insufficient Sign # 7. It is obvious that Griffith Oliver encountered a surprise situation and was unable to sufficiently react to the situation.
"In short, this Court concludes that the State failed to provide warning signs commensurate with the danger to be encountered by the motoring public.
"As stated in the Supreme Court case of Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 [(La.)]:
`There is no fixed rule for determining what is a dangerous defect in a public way; the facts and surrounding circumstances of each particular case control. The test usually applied, however, requires an answer to the question: Was the public way maintained in a reasonably safe condition for persons exercising ordinary care and prudence?'"
This court can find no error in these findings and conclusions, which are completely substantiated by the record.
Dr. Irving Fosberg, a psychologist, stated that if the lights were out on the overpass in question at the time of the accident (as noted in the police report), then a driver going from the daylight illumination of Causeway Boulevard to the nighttime vision conditions of the overpass would, at least for two or three minutes, lose the capacity to perceive since there was a failure of sufficient clues available to excite the day vision receptors in that dangerous situation.
*278 James R. Fister, accepted by the court as an expert in civil engineering, said that his study of the structure on which the accident occurred revealed that it did not comply with the 1954 standards of the American Association of State Highway Officials, which were in effect at the time that the overpass was built.
Fister explained that the loop-like structure at the interchange of U.S. 90 and Causeway Boulevard had a 43-degree curvature on the "as built" plans but that a 24-degree curve is the maximum that should be used on any mainline roadway. He added that the less curvature the less difficulty a driver experiences in negotiating the turn.
It was also Fister's opinion that the superelevation or the raising of the outside edge of the pavement, which keeps the vehicle on the road in a curve, should have been .12 feet per foot; however, on this structure it was only .05 feet per foot. He also said the roadway did not meet the minimum standards in regard to its superelevation runoff or lead-in to the curve. He explained that for a 25-mile-per-hour design the transition should be 91 feet and for a 20-mile-per-hour design the transition should be 78 feet; however, at the accident site there was a 200-foot transitional lane, which was too long, giving the driver not enough lead-in to the curve.
Fister stated that the pavement width of this overpass was 28 feet whereas it should have been 32 feet and that the vertical control of the roadway was deficient, giving the driver the sensation that his headlights go out in space. It was also his opinion that the roadway should have a posted speed of 15 miles an hour, a lesser speed than the design speed. He added there were too many signs in place at the time of the accident (which would tend to confuse a driver); the signing was improper; and if the lights were out on the structure an even more hazardous situation would be created for a driver approaching the location at night. He thought for a foreign driver unfamiliar with the situation the seriousness of the surprise element would be magnified.
Olin Dart, also accepted by the court as an expert in the areas of civil engineering, design, traffic safety and traffic reconstruction, stated, contrarily, that as a loop ramp, which he considered an interchange facility, the design of the roadway was in conformance with the 1954 AASHO standards in every regard. He added the design of the structure met the specifications, as did the elevation, superelevation and pavement width. He classified this overpass as not a main road but a facility used to terminate one route into another. He also said the principal sign there met the manual requirements as did its placement. His conclusion was that the loop ramp in question was reasonably safe for a careful and prudent motorist. Dr. Dart admitted approximately 30 other accidents had occurred at or near this accident site, somewhere on the loop ramp; however, his opinion was that in those in which the vehicle appeared to have gone out of control, as in the present case, there were extenuating circumstances to account for most of these happenings such as driver inattentiveness, drinking or excessive speed.
On cross-examination, however, Dart also admitted that if the 20-mile-per-hour sign were 24 by 24 inches in size it would not comply with the standard as spelled out in the regulatory manual; he could also reach no positive conclusion as to whether, if some of the lighting was out on the ramp, this could have caused the accident. He estimated the speed of the Oliver vehicle, based on the number of feet it traveled along the rail and the damage to the car, at between 40 and 45 miles per hour, but added the downward flow of the roadway would keep it going. He also said that a design speed is many times lowered at a point because of factors such as location and build-up.
Both Patsy Miller and Boyd Gautreaux, engineers employed by the Highway Department, testified that the design of the loop met the minimum standards and the signing of the area was proper and adequate.
*279 Mark Rukavina testified by deposition (which was introduced at the trial) that there were three people, including himself who were with Oliver, the driver of the vehicle, at the time of the accident. He said one passenger in the vehicle had come into town to visit Oliver for business reasons and that the foursome had dinner and each consumed one drink before the meal and one drink afterward. He said the group then proceeded to the French Quarter where they each had one drink at Pat O'Brien's. He said they then went to a sandwich shop but they could see from the roadway that it was closed, so he instructed Oliver that probably the easiest thing to do was to go to the end of Causeway to turn around and come back. He said although he had been on the structure before he knew there was no reason for either himself or Oliver, living where they did, to normally go that way, and he had no recollection of Oliver ever driving over the structure previously.
Rukavina also testified there was a slight fog or mist that night, and he thought the speed of the car at the time of the accident would have been around 30 miles per hour. He said the speed was a normal one for the situation and there was nothing unusual about the approach to the turn, as far as he was concerned. He did not know why Oliver had not been able to negotiate the turn.
The accident report, an exhibit in the case, listed estimated speed of the subject vehicle at 50 miles per hour and stated that the weather was cloudy and there were no street lights. It was the opinion of the officer making the report that the driver had been drinking (due to the odor of alcohol about his person) and he also believed the vehicle was being driven at a speed too fast for the curved roadway. A blood alcohol test, however, was not done due to the seriousness of the driver's condition.
This court is bound by the statement articulated in Canter v. Koehring Company, 283 So.2d 716 (La.1973), at 724:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts."
This court also said in the case of Reggio v. Louisiana Gas Service Company, 333 So.2d 395 (La.App. 4th Cir. 1976), at 406:
"On the questions of negligence and causation, LGS has sought to demonstrate weakness in plaintiffs' case by contending that the verdict was based on speculation and by pointing to testimony of LGS experts which relegated plaintiffs' theories to the realm of mere possibility, rather than probability. We reject this position for two reasons. First, we are dealing with a jury verdict of liability and in an appellate review we are limited to the question of whether there is evidence in the record which furnishes a reasonable factual basis for that verdict. Canter v. Koehring Company, 283 So.2d 716 (La.1973). While LGS's experts differed sharply with plaintiffs', and while it may be argued that the former were better qualified and more believable, it is not our function to substitute our own judgment for that of the jury's on these matters. * * *"
Similarly, this court stated in Simoneaux v. Davis, 397 So.2d 835 (La.App. 4th Cir. 1981), at 837:
"Turning to the issue of liability on the part of the Department, we note that numerous experts were presented. The *280 question of assessment of the credibility of competing expert witnesses is one better resolved by the trial judge who has the opportunity to observe the respective demeanors of the witnesses. In this area, as in other areas of factual determination, we cannot disturb the factual determinations of the trial judge unless upon our independent review of the record we find that he was manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (1978)."
In the present case, although there was a wide divergence in the expert opinions and conclusions reached by Fister and Dart, and although the Highway Department engineers also testified that the design of the subject roadway did meet minimum AASHO standards in effect at the time it was built, we can find no manifest error in the trial court's acceptance of Fister's expert testimony over that of Dart, especially considering that Fister was extremely articulate in explaining details of the methods and calculations which he had used to arrive at his conclusions.
The standard of law to be applied in a case of this type was articulated in Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975), wherein the court said at 432-433:
"There is no fixed rule for determining what is a dangerous defect in a public way; the facts and surrounding circumstances of each particular case control. The test usually applied, however, requires an answer to the question: Was the public way maintained in a reasonably safe condition for persons exercising ordinary care and prudence? Arata v. Orleans Capital Stores, [219 La. 1045, 55 So.2d 239] supra; cf. Nessen v. City of New Orleans, 134 La. 455, 64 So. 286 (1914); Allen v. Town of Minden, 127 La. 403, 53 So. 666 (1910)."
In Norris v. State, 337 So.2d 257 (La.App. 3d Cr. 1976), furthermore, the court explained at 260-261:
"The Department of Highways is not the guarantor of the safety of all travelers on state highways nor is it the insurer against all injuries and damages which may result from defects or obstructions thereon. Wilkinson v. American Insurance Company of Newark, New Jersey, 311 So.2d 584 (La.App. 3rd Cir. 1975); Doucet v. State, Department of Highways, 309 So.2d 382 (La.App. 3rd Cir. 1975), writ denied 312 So.2d 340 (La.); Laborde v. Louisiana Department of Highways, 300 So.2d 579 (La.App. 3rd Cir. 1974), writ denied 303 So.2d 182 (La.).
"The duty of the Department of Highways has been most recently stated by this court in the case of Doucet v. State, Department of Highways, supra:
`The duty of the Department of Highways is only to see that state highways are reasonably safe for persons exercising ordinary care and reasonable prudence. It is liable for damages only when the evidence shows (1) that the hazardous condition complained of was patently or obviously dangerous to a reasonably careful and ordinarily prudent driver ...'. (Emphasis added) (Citations omitted).
See also Von Cannon v. State, Department of Highways, 306 So.2d 437 (La. App. 3rd Cir. 1975), writs refused 309 So.2d 681 (La.), and numerous cases cited therein.
"Also pertinent is the recent Supreme Court case of Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La. 1975), in which the court stated:
`There is no fixed rule for determining what is a dangerous defect in a public way; the facts and surrounding circumstances of each particular case control. The test usually applied, however, requires an answer to the question: Was the public way maintained in a reasonably safe condition for persons exercising ordinary care and prudence?' (Citations omitted)
"The Highway Department is only required to warn motorists of unusual or perilous hazards in the road. See Wall v. American Employers Insurance Company, 215 So.2d 913 (La.App. 1st Cir. 1968), writ refused 253 La. 325, 217 So.2d 415; Muse *281 v. W. H. Patterson & Company, 182 So.2d 665 (La.App. 1st Cir. 1965); and Rosier v. State, 50 So.2d 31 (La.App. 2nd Cir. 1951). * * * * * *
"There are several cases in the jurisprudence where the courts have found that, although there was room for improvement in the road conditions and signing on certain road, the efforts of the Highway Department were adequate to discharge its duty to the motoring public. See Roberts v. Winston Carriers, Inc., 304 So.2d 818 (La.App. 3rd Cir. 1974), writ refused 309 So.2d 341 (La.); Weber v. T. L. James & Company, Inc., 271 So.2d 608 (La.App. 1st Cir. 1972); Edwards v. State, Department of Highways, 271 So.2d 672 (La.App. 1st Cir. 1972), writ denied 274 So.2d 391 (La.); Travelers Insurance Company v. Ragan, 202 So.2d 302 (La.App. 1st Cir. 1967).
"Failure to comply with the requirements of the Highway Department's manuals does not constitute negligence per se. Harkins v. State Department of Highways, 247 So.2d 644 (La.App. 3rd Cir. 1971), writ denied 259 La. 741, 252 So.2d 449."
Based on the testimony adduced at trial, however, this court can find no error in the district court's determination that the overpass in question was negligently designed by the Highway Department, that it was not maintained in a reasonably safe condition for persons exercising ordinary care and prudence, and that the Highway Department also failed to give adequate warning through proper signing of the danger that lay ahead to approaching motorists. As the court noted in U. S. F. & G. Co. v. State, Dept. of Highways, 339 So.2d 780 (La.1976), at 785:
"* * * In order to hold the Department of Highways liable for an accident caused by an unsafe or hazardous condition it must be shown that the Highway Department had prior notice, either actual or constructive, of the dangerous condition and had sufficient opportunity to remedy same or at least to alert and warn motorists of its presence and failed to do so. Coleman v. Houp, 319 So.2d 831 (La.App.3d Cir. 1975)."
In the present case considering all of the evidence and particularly the accident rate of the overpass in question during the years before this accident, we find that the Highway Department had prior notice of the dangerous condition and had sufficient opportunity to remedy same or at least to alert and properly warn motorists of its presence and failed to do so.
The court also said in McCullin v. State Department of Highways, 216 So.2d 832 (La.App.2d Cir. 1968), at 834:
"The State of Louisiana owes to the public a duty to maintain its highways so they will be in a reasonably safe condition for the traveling public at all times. This duty encompasses an obligation to have an efficient and continuous system of inspection of the highways and bridges. The Highway Department, however, is not required to maintain a perfect condition of repair or system of inspection, but its officers and employees are required to use ordinary and reasonable care in order to insure that the highways and bridges will be in a reasonably safe condition. Hogg v. Department of Highways of State of Louisiana, 80 So.2d 182, La.App. 2 Cir. 1955."
Regarding the lack of lighting on the bridge, or overpass, at the time of the accident, no evidence was presented by either party in the way of testimony to show that there was notice to the Highway Department that the lights were out on the structure or that they had been out for a long enough period of time to constitute constructive notice. However, a check of the record reveals that in its answers to the plaintiff's interrogatories the Highway Department stated that no inspections were made of the guardrails, lights or warning signs at any time during the previous 10 years. Such an admission allowed the trial court as well as this court to conclude there was constructive notice to the Highway Department of that deficiency in the roadway.
*282 Regarding the defense of contributory negligence the court said in LeJeune v. State, Department of Highways, 215 So.2d 150 (La.App. 3d Cir. 1968), at 153:
"The trial court correctly rejected this contention. He who relies upon contributory negligence bears the burden of proving the facts which justify application of this special defense. Deshotels v. Southern Farm Bureau Cas. Ins. Co., 245 La. 23, 156 So.2d 465. * * *"
In Hodges v. State, Through Dept. of Highways, 370 So.2d 1274 (La.App.3d Cir. 1979), the court also said at 1279:
"* * * The burden of convincing the triers of fact on the issue of contributory negligence rested with the defendants and they failed to convince either the trial court or the jury in this instance. We cannot say that there was manifest error or that the trial court and jury were clearly wrong in concluding that Hodges was not contributorily negligent."
The defendant in the present case, however, has also cited the case of Simon v. Ford Motor Company, 282 So.2d 126 (La. 1973), wherein the court stated, on rehearing, at 133:
"The trespassing motorist `having caused the accident by leaving his own traffic lane, is presumed guilty of negligence and the onus rested on him to demonstrate that the accident resulted from such a state of unforeseeable circumstances beyond his control (and to which he did not contribute), that he could not extricate himself, despite the efficient use of all protective measures at his command. In other words, it was his burden to show that he was not guilty of any dereliction, however slight, which may have had causal connection with the accident. We say this because it seems only reasonable to resolve that a motorist owes to the traveling public the duty of remaining in his own lane of traffic and, when he undertakes to enter the lane devoted to approaching traffic, he must be held strictly accountable for all damages resulting therefrom unless he clearly exhibits that his conduct in no wise contributed to the accident. By this, of course, we do not mean that such a motorist is the insurer of the safety of those injured in an accident such as the one in the instant case but only that, in order to be exonerated, he must establish his freedom from all fault by convincing proof.' * * *"
This court, in the subject case, cannot hold that the district court judge was in manifest error in concluding Oliver was not contributorily negligent. Rukavina, who was with the plaintiff all evening, testified he believed Oliver had consumed only three drinks, two of which were associated with dinner. He also stated that the speed of the car was not in excess of 30 miles an hour and normal for the situation. He added Oliver was probably not familiar with the overpass.
Although the police report referred to the smell of alcohol and estimated an excessive speed, the reporting officer did not testify at the trial or by deposition. No other facts tending to show contributory negligence on Oliver's part were established at trial; therefore, we must conclude, as did the trial court, that the defendant failed to carry its burden of proof in this regard and that the plaintiff did show under the dictates of Simon, supra, that he was not guilty of any dereliction that may have had a causal connection to the accident, which resulted instead from unforeseeable circumstances beyond his control.
On the issue of the quantum of damages awarded, this court can find no reason to alter the awards of the district court for which a reasonable basis can be found in the record.
In his reasons for judgment the trial court judge stated:
"Griffith Oliver's tragic injuries are summarized in the deposition of Doctor Michael Dzubaty. Suffice it to say, that Mr. Oliver has permanent mental and physical injuries which have rendered him permanently and totally disabled. He is presently in a nursing home in Connecticut *283 and there is little or no prospect for improvement in his condition. His damages are itemized as follows:
Lost WagesPast and Future $ 261,672.00
Physical & Mental Pain and
SufferingPast, Present and
Future 400,000.00
Medical ExpensesPast, Present
and Future 639,920.00
 _____________
 $1,301,592.00"
Melville Wolfson, an expert in the field of actuarial science, testified that, based on a life-work expectancy of Oliver of 33.8 years, his estimate of future lost wages (based on the minimum wage and discounting 5 percent) was $238,000. He also estimated that past lost wages were approximately $23,600, completely substantiating the district court's total award of $261,672 in past and future lost wages.
Neither can this court find error in the award made for past, present and future medical expenses. John Farling, administrator of the nursing home where Oliver is now cared for, testified the present rate for room, medication and air conditioning was approximately $13,000 per year. Considering the 40-year life expectancy of Oliver, plus expected inflationary rises in these rates, as well as other care sometimes required (as testified to by his attending physician), the $639,920 award was a reasonably accurate one.
The medical director of the nursing home, Dr. Michael Dzubaty, testified by deposition that the plaintiff is thin, he does not communicate and is subject to bouts of pneumonia and seizures, which require hospitalization. He must be fed by a gastrotomy feeding tube, is incontinent of urine and feces, and must be given physiotherapy. He stated that his condition is a result of a depressed fracture received in the accident.
The physician added that the plaintiff's hands are flexed onto his chest and his hands are usually in a roll to prevent contracture downward of his fingers. He said Oliver cannot express himself and he doubted very much if he perceived anything that is being said to him; his neck shows a tracheotomy site which is not completely closed and requires suctioning; and he requires lifting from bed to chair. Because the plaintiff is unable to swallow, blenderized food or liquids are passed through the gastrotomy tube into his stomach. Dr. Dzubaty also stated that Oliver's condition had not improved in the two and a half years he had known him, and he did not foresee any type of improvement in the future.
This court is extremely sympathetic with the pain and suffering endured by this young man in his present state; however, we cannot conclude that the trial court's award of $400,000 in this regard was such a clear abuse of its much discretion as would allow us to increase it. Reck v. Stevens, 373 So.2d 498 (La.1979).
For the reasons assigned, therefore, the district court decision is affirmed.
AFFIRMED.