529 So.2d 504 (1988)
Elizabeth and Michael MARZIALE
v.
Joseph and Iris MANEY, State of Louisiana Through Dept. of Transportation and Development, et al.
No. CA-7149.
Court of Appeal of Louisiana, Fourth Circuit.
June 28, 1988.
Rehearing Denied August 11, 1988.
*505 Edmund W. Golden, Golden, Fonte & Faulkner, Metairie, for plaintiffs.
Norman L. Sisson, Sharon F. Lyles, Lawrence A. Durant, Durant, Pierce & Malone, Baton Rouge, for defendantsState of La.
Before BARRY and WILLIAMS, JJ., and PRESTON H. HUFFT, Judge Pro Tem.
BARRY, Judge.
The Louisiana Department of Transportation and Development [DOTD] appeals from a judgment holding it fifty percent responsible for injuries sustained by Elizabeth Marziale in an automobile accident on an elevated portion of Interstate 10, known as the High-Rise Bridge [HRB]. The trial court's reasons summarize the facts:
The uncontroverted and undisputed facts are that Marziale was driving her 1981 vehicle on September 15, 1983, in the extreme left lane, east bound, to work at Lake Forest Shopping Center, at approximately 8:30 a.m., on the elevated portion of Inter-state 10 (I-10) approaching the upgrade of the HRB. She was traveling 50 mph (the legal limit is 55 mph) approximately five to six car lengths behind a van. As she proceeded up the bridge slope, her view ahead was completely and totally obstructed because of the van and the grade of the HRB. Suddenly, without any warning or signal, the van swerved into the center lane, exposing for the first time, a car stopped directly ahead of Marziale in the left lane. She immediately removed her foot from the accelerator, looked into the rear view mirror to ascertain if she could change into the center lane, and discovered that it was blocked by a car on her right. She immediately applied her brakes, moved to the far right side of the left lane and struck the rear of the stalled car, just below the bridge apex.
The Marziales sued DOTD, the City of New Orleans, Joseph and Iris Maney, the owner and the driver of the stalled vehicle, and the respective insurers. The Marziales evidently settled and dismissed all the defendants except DOTD. Third party plaintiffs concurred in the motions to dismiss. The trial was bifurcated on liability and quantum.
After the trial and prior to judgment the court granted DOTD's motion to re-open the case on a limited basis. The judge re-opened the record for the defense to impeach or contradict the theory of Andrew Ramisch, a plaintiff's expert, as to the feasibility of restriping the HRB. The Marziales were permitted to offer additional proof and examples of the adoption of the restriping configurations. The State's writ application to this Court relative to the trial judge permitting the plaintiff to introduce evidence was denied. No. C-5750.
The trial court found DOTD negligent and strictly liable and held Mrs. Marziale fifty percent (50%) and DOTD fifty percent (50%) at fault. Mrs. Marziale was awarded $1,440,682 which was reduced by her 50% fault to $720,341 plus expert fees.
The trial court did not mention the other defendants or their possible percentages of fault. The settling defendants' percentage of fault should have been at issue in order to reduce the total award proportionately. La.C.C.P. Art. 1812; La.C.C. Art. 2324. See also Ainsworth v. Employees Insurance Company, 427 So.2d 1220 (La.App. 3rd Cir.1983), affm'd 433 So.2d 709 (La. 1984). Because we find that the plaintiffs did not carry their burden of proof, this matter is pretermitted.
DOTD specifies nine trial court errors: (1) and (2) holding that Iris Maney's car was stalled, and if stalled, that it did not contribute to the accident; (3) failing to find Mrs. Marziale the sole cause of the accident; (4) concluding DOTD's failure to *506 provide shoulders on the HRB was unreasonable which created an obviously dangerous situation for the reasonably prudent driver; (5) concluding DOTD cannot avoid liability because the bridge was built to existing standards; (6) ignoring defense expert testimony; (7) permitting the opinion of plaintiff's expert (which was contradicted) to overrule DOTD's administrative decision as to the HRB; (8) finding DOTD strictly liable; (9) awarding excessive damages.
DOTD is the State agency responsible for the design, construction and maintenance of safe highways, including the HRB. However, DOTD is not responsible for every accident occurring on state highways nor is it the guarantor of the safety of travelers thereon or an insurer against any and all injury which may result from defects in such highways or interstate systems. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980); Evans v. Salter, 450 So.2d 706 (La.App. 4th Cir.1984).
The trial court found liability under Art. 2315 negligence and Art. 2317 strict liability. In Bennett v. Bardwell, 480 So.2d 349 (La.App. 3rd Cir.1985), the difference between the two theories as they relate to DOTD's liability for an auto accident on a bridge was discussed:
[T]he only difference between the two theories is that in a strict liability case, based on LSA-C.C. Art. 2317, the claimant is relieved of proving that the owner knew or should have known of the unreasonable risk of injury created by the thing he owns.
. . . . .
Liability based on negligence is imposed when the DOTD is actually or constructively aware of a hazardous condition and fails to take corrective action within a reasonable time. Robinson v. State Through Dept. of Transp., 454 So.2d 257 (La.App. 1st Cir.1984), writ denied, 458 So.2d 122 (La.1984). This liability stems from its duty under LSA-R.S. 48:21 to `improve, maintain, repair, and regulate the use of public transportation systems and to perform such other functions with regard to public highways, roads, and other transportation related facilities as may be conferred on the department by applicable law.' LSA-R.S. 48:1 includes bridges in its definition of `highway.'
480 So.2d at 351-52.
Under either theory the claimant must prove that the HRB created an unreasonable risk of injury that resulted in damage. To prove negligence the plaintiff must prove that DOTD knew or should have known of the risk and failed to render the HRB safe. Under strict liability DOTD's knowledge of the risk would be presumed. The reasonableness (under notions of blameworthiness) of DOTD's conduct would be determined in light of that presumed knowledge. See Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982).
While the basis for determining the existence of a duty is different in strict liability and ordinary negligence cases, the duty is the same. Myers v. State Farm Mutual Automobile Insurance Company, 493 So.2d 1170 (La.1986). DOTD is only required to maintain the highways in a reasonably safe condition for motorists exercising ordinary care and reasonable prudence. Dagnall v. Louisiana Department of Highways, 426 So.2d 276 (La.App. 4th Cir.1983), writ denied 433 So.2d 160 (La. 1983); Oliver v. Parish of Jefferson, 408 So.2d 275 (La.App. 4th Cir.1981), writ denied 413 So.2d 495 (La.1982).
Whether DOTD has breached its duty, whether the roadway at the scene of the accident was in an unreasonably dangerous condition, depends upon the particular facts and circumstances of each case. Myers v. State Farm Mutual Automobile Insurance Company, supra.
Andrew Ramisch, plaintiff's expert in highway design and traffic engineering, testified that when the HRB was opened to traffic in early 1966, the law did not require the bridge to have shoulders. On November 3, 1966 the law changed to require that any major long span (such as the HRB) built or designed thereafter had to provide full width shoulders. The Department of Commerce, Bureau of Public *507 Roads (now Federal Highway Administration under the Department of Transportation) adopted that policy as a result of the position taken by the American Association of State Highway Officials [AASHTO].
Therefore, the HRB was constructed according to then existing standards, a fact noted by the trial court. However, the lower court's conclusion that the HRB was obsolete the day it was unveiled is not determinative of the liability issue. Importantly, DOTD's failure to update or upgrade its highways and interstates to meet current standards or even guidelines promulgated subsequent to the opening of the HRB does not establish a hazardous defect. To impose upon the State the burden of updating its thousands of miles of highways to meet the latest guidelines would be an impossible undertaking. Robinson v. Estate of Haynes, 509 So.2d 128 (La.App. 1st Cir.1987); Usry v. Louisiana Department of Highways, 402 So.2d 240 (La.App. 4th Cir.1981), writ denied 404 So.2d 1259 and 406 So.2d 613 (La.1981); Devall v. Morgan, 424 So.2d 522 (La.App. 5th Cir. 1981), writs denied 427 So.2d 1214 (La. 1983).
The reasonableness of DOTD's actions in the present case is the determinative factor. The trial court noted that on the HRB between 1979 and 1983 more than 3,051 accidents occurred, of which thirty-two percent (32%) involved injury (N.O.P.D. chart). Based on DOTD's statistics it ranked the HRB in the top 20% of hazardous locations for ten straight years; in the top 10% nine of ten years; and in the top 5% six of ten years. We agree with the trial court that DOTD knew or should have known of the dangers on the HRB. However, we find no correlation (nor did the experts) between the accident frequency and the absence of a shoulder on the HRB.
It is obvious from the testimony and DOTD's arguments that the agency was aware of the accident rate. The trial court noted that traffic on the HRB rose from 26,040 vehicles in 1969 to 126,630 vehicles per day in 1983.[1] The volume exceeded the bridge's design capacity and totally exacerbated traffic problems on the span.
Boyd Gautreaux, an expert in traffic engineering employed by DOTD as a traffic operations engineer, testified there was a project for a Louisa Street interchange modification in the planning stage for three or four years. DOTD conducted a study on the HRB in July and October, 1983. The Regional Planning Commission (comprised of parishes within the New Orleans metropolitan area and DOTD) and the City sought to alleviate the congestion. Their study included the effect of closing the Louisa Street on-ramp which revealed many benefits, but the project was delayed because of the project to widen the Danzinger Bridge from four to six lanes to increase its capacity and decrease traffic on the HRB.
It is obvious that DOTD was searching for solutions. We do not dismiss as palliative (the trial court did) DOTD's measures of "cooperating with the New Orleans Police Department by placing wreckers on the HRB during prime accident times, widening the Danzinger Bridge, temporarily closing entrance/exit ramps during peak traffic periods and studying traffic volume...." The trial court stated that "[a]ll experts agree that only a new bridge will permanently solve the HRB's problems."
The trial court's finding of liability is based on a proposal by Andrew Ramisch to restripe the lanes as an interim solution, which DOTD did not undertake. The HRB consists of two 40 feet wide concrete roadways separated by a cement medium with the eastbound roadway divided into three lanes. Ramisch testified:
There is a left-hand yellow outline on the outside of travel of the left lane which is five inches wide. Past there is a ten-inch shoulder up to the curb. The left lane is twelve feet six inches wide. There is a five-inch white edge line which divides the center line. The center line of travel *508 to the next inside of edge lane measures eleven feet zero inches. There is then another four-inch white lane line. Then there is the right-hand lane which is twelve feet one inch wide from the inside of the edge line to the outside of the white edge line on the right lane. This edge line is, I believe, it was four inches wide, and then there is a two-foot one inch shoulder or curb area here up to the base of the curb.
He suggested restriping the lanes to provide the following configuration:
A six-foot shoulder including the width of the edge line on the inside toward the median of the bridge, a ten and a half foot lane which goes to the center of the center of the lane line, another ten and a half foot lane to the center of this line, a full twelve foot lane from this lane line to another edge line, then a white four-inch edge line which is part of a one foot shoulder over here. This would allow the same number of lanes going across the bridge as currently go across the bridge.
Ramisch said AASHTO and the Federal Highway Administration generally recognize restriping as an acceptable solution and cited two examples of forty foot structures that had been restripedthe Galveston causeway and I-395 in Washington, D.C. He estimated the cost to restripe the HRB would be $26,000 for removal of the old and $13,000 for installation of the new striping.
In discussing the possibility of restriping to provide ten and a half foot lanes, Boyd Gautreaux stated that according to the Transportation of Traffic Engineering Handbook, narrow lanes and intermittent hazardous obstructions near the edge of the travel lane increase driver tension and cause drivers to place greater distance between vehicles and to reduce speeds. The result would be a decreased volume of traffic using the bridge and peak driving times would be longer. According to several manuals, Gautreaux said that no less than eleven foot lanes should be used on interstate systems.
Andrew Ramisch conceded that the Highway Capacity Manual stated that any lane width less than 12 feet reduces capacity and the Federal Highway Administration dictated that interstate lanes should be 12 feet. He acknowledged that in Houston where lanes were narrowed accidents increased.
Dr. Joseph Blaschke, a defense expert and assistant research engineer with Texas A & M University, testified that reducing the lane width from 12 feet would increase sideswipe accidents, reduce speed, and lower the volume of traffic on the roadway.
When the case was re-opened, deposition testimony of Andrew Ramisch and Joseph Blaschke on the restriping proposition was filed. Ramisch conceded a mistake as to the location of the shoulder of the Galveston causeway which was on the right, not the left side. He also admitted that I-395 in Washington, D.C. had three twelve foot lanes and was not supportive of his theory. He could not cite an example where an interstate highway had been restriped solely to create a left hand shoulder and admitted most of the examples he cited added a lane. Ramisch acknowledged the potential for an increase in sideswipe accidents due to narrowing the lanes.
Dr. Joseph Blaschke stated that Ramisch's restriping solution is acceptable in certain situations. He noted that in Ramisch's examples existing lanes were narrowed to add a lane in order to provide additional capacity. Dr. Blaschke concluded that if restriping was a solution, a seven foot shoulder should be placed on the right side so that vehicles would not have to cross the faster lanes of travel. The more readily accepted right hand shoulder would not have prevented this accident.
The plaintiff's reliance on Mr. Ramisch's proposed restriping is grossly insufficient to carry her burden. Two credible defense experts clearly testified that the anticipated decrease in the volume of vehicles and increase in the number of accidents militated against restriping in order to create a left shoulder. The Marziales did not prove that DOTD breached its duty to maintain a safe highway or that the HRB (without a *509 left shoulder) was defective and obviously dangerous without restriping. See Tircuit v. Board of Commissioners for the Orleans Levee District, 496 So.2d 1136 (La. App. 4th Cir.1986), writ dismissed 498 So. 2d 5 (La.1986).
The cause of this accident was the stalled vehicle in plaintiff's lane of travel and her inability to avoid the impact.
We conclude DOTD was not negligent or strictly liable for failing to restripe the HRB for the sole purpose of creating a left hand shoulder. The lower court judgment to the contrary was clearly wrong.
Having found merit in specifications 4, 5, 6, 7 and 8 we pretermit discussion of the other specifications.
The judgment is reversed.
REVERSED.
NOTES
[1] The trial court listed 126,630 vehicles traveled on the HRB in 1983 but Gautreaux's testimony lists 110,156 in 1983 and 126,630 in 1984.