553 So.2d 902 (1989)
Mary B. BELL and James A. Bell
v.
STATE of Louisiana, Louisiana Stadium and Exposition District, and Facility Management of Louisiana, Inc.
No. 88-CA-2329.
Court of Appeal of Louisiana, Fourth Circuit.
November 16, 1989.
*903 J. Michael Placer, Lafayette, for plaintiffs-appellants.
Joseph I. Giarrusso, Jr., Mark M. Gloven, McGlinchey, Stafford, Mintz, Cellini & Lang, P.C., New Orleans, for defendants-appellees.
Before BARRY, WARD and WILLIAMS, JJ.
BARRY, Judge.
Mary and James Bell appeal a judgment which dismisses their suit against the State, the Louisiana Stadium and Exposition District, and Facility Management of Louisiana, Inc. for damages from Mary Bell's fall down steps at the Louisiana Superdome.

FACTUAL TESTIMONY
Mrs. Bell testified at the bench trial that she and her husband, James Bell, along with friends Annette and Asa Broussard, attended a Saints game on November 9, 1986. Mrs. Bell was wearing high heels. After the game, they left the Superdome from the plaza level (about 3:30 to 4:00 p.m.) and walked down stairs to the parking garage. Mrs. Bell started down the middle of the steps in a large crowd behind her husband and in front of the Broussards and fell down. She did not use the handrails on each side of the steps. Mrs. Broussard claims to have found Mrs. Bell's shoe on the top step with the heel in a small hole.
Mrs. Bell testified that she could not stand and her left foot was swelling. Mr. Broussard carried Mrs. Bell to the car and Mr. Bell drove to Hotel Dieu hospital's emergency room (the Broussards remained in the car). A splint was placed on her foot and later that night she went to Lafayette General Hospital for treatment by an orthopedist, Dr. Gregory Gidman.
Mrs. Bell inspected the steps in November, 1987 with Mrs. Broussard, Ralph Junius (an expert), and her attorney Oscar Reed, Jr. Mrs. Broussard corroborated Mrs. Bell's testimony about the fall and the subsequent inspection.
Mrs. Bell stated that Dr. Gidman performed a reduction and placed pins in her dislocated foot. She spent five days in the hospital and had a cast on her foot for six to seven weeks. Mr. Bell's testimony corroborated his wife's details as to the fall and her treatment. Mr. Bell did not see the cause of his wife's fall.
Odele Grosz, personnel director for Facility Management, testified that she handled security and first aid reports for the Superdome. She said that on November 11, 1986 she learned of Mrs. Bell's accident by telephone when Mrs. Bell called her and she prepared a claim report. According to her written first aid report admitted at trial, Mrs. Bell fell on steps outside Gate A when the heel of her shoe caught in the rubber pad on the steps. Mrs. Bell told Ms. Grosz that the rubber had a crack and her heel got caught. Mrs. Bell told Ms. Grosz that she fell down three steps. Although Ms. Grosz conceded that in an earlier deposition she stated that the phone report was taken *904 on November 9, 1986, she testified the deposition was incorrect.

EXPERT TESTIMONY
Ralph Junius, an expert civil engineer retained by Mrs. Bell's counsel, testified that he inspected the stairs on November 19, 1987. He said the hole measured one and a half inches long and had been there "for some time." He felt the hole was a hazard to a female wearing high heels. He declared that it would take a "certain random chance," however, for such a fall to occur.
Mr. Junius reviewed Chapter 33 of the New Orleans Building Code (adopted in 1949 but revised) and the National Fire Prevention Association [NFPA] Sections 101 and 102, which he felt were applicable. The Superdome opened in 1975 after ground breaking in 1971. Article 3302 of the Building Code provided that the variation in the heights of risers could not exceed 3/16 inch with no variation in treads. Although Mr. Junius noted such a variation in the stairs in question, he did not feel that condition was particularly hazardous.
Mr. Junius said that Article 3305[1] of the Code provided that stairways over seven feet wide have one or more continuous intermediate handrails so that there is no more than sixty-six inches between adjacent handrails. Because the steps in question were substantially wider than seven feet,[2] Mr. Junius concluded the stairs were not in compliance with that article. There were no intermediate handrails where he determined two would have been necessary because of the width of the stairs.
Mr. Junius reviewed a May 15, 1970 letter written by Murvan Maxwell, Chairman which concerned a ruling of the New Orleans Board of Building Standards and Appeals after a public hearing on a variance. The letter provides in pertinent part:
Pursuant to the public hearings conducted on 4 December 1969, and on 4 March 1970, encompassing the above cited appeal [Louisiana Stadium Project], this Board rules as follows:
1. Because of the immense volume of the contemplated structure, together with the fact that ample and positive automatic venting to the atmosphere is to be provided in the apex of the ceiling, the provisions of Standard No. 102-1967, "Tents, Grandstands, Air Supported Structures Used for Places of Assembly", as promulgated by the National Fire Protection Association, may be utilized as design criteria for the grandstand seating, aisles, exitways, folding and telescopic seating, etc., of subject domed stadium.
2. The travel distance number and arrangment of vomitories, concourses, exitways and exitson all levelsare acceptable as proposed and presented to this Board.
* * * * * *
5. The method of egress from the field level, including provisions for access to refuge in the adjacent garage area via adequately designed and rated openings (with ways of egress thereto properly marked), as proposed and presented to this Board, is hereby approved.
* * * * * *
The above waivers may be incorporated in the construction documents, which *905 documents shall be submitted to the Department of Safety and Permits in the prescribed manner for review, analysis, and approval.
Mr. Junius interpreted the first paragraph to mean that NFPA 102 would be acceptable within the confines of the dome (which he feels would include the stairs at issue) instead of the New Orleans Building Code provision relative to stairs.
NFPA No. 102 (1967 edition), paragraph 23, Article 222 provides:
The materials, design, fabrication, and construction of structures or devices included within the scope of this standard shall comply with the approved construction standards for safety to life and property. Where no specific standards are prescribed, conformity with the following applicable standards shall be deemed as compliance with approved standards for safety to persons and property.
* * * * * *
(f) MEANS OF EGRESS. Life Safety Code, NFPA No. 101-1967, National Fire Protection Association.
Mr. Junius testified that No. 102 made NFPA No. 101 applicable since No. 102 does not provide standards for exits.
NFPA NO. 101 (1967 edition), paragraph 5-3164d under Handrail Details, provides:
Every stairway required to be more than 88 inches in width shall have intermediate handrails dividing the stairway into portions not more than 88 inches in width, except that on monumental outside stairs 2 handrails may be permitted.
According to Mr. Junius, the stairway was more than 88 inches in width and required one intermediate handrail. He concluded that the stairway was in violation of NFPA No. 101. Mr. Junius acknowledged paragraph 5 of the May 15, 1970 letter approved the method of egress from the field level including provisions for access to the adjacent garage area. He conceded that he did not know what proposal was before the Board and could not comment. He also concluded that the paragraph appeared to be directed to the field level which he distinguishes from the plaza level at issue here.
When questioned about whether the exception for monumental stairs might be applicable, Mr. Junius defined monumental stairs as "stairways that are not necessarily required stairs." They are not required for the safe egress of people. Such stairways are designed for visual impact. Mr. Junius read from NFPA No. 101, paragraph 5-3181 which provides that monumental stairs (inside or outside) may be accepted as a required exit if all requirements for exit stairs are met. Therefore, if monumental stairs are required exits from a building they must comply with the handrail requirements of NFPA Nos. 101 and 102. Mr. Junius stated that the stairway in question is in violation of the New Orleans Building Code and NFPA Nos. 101 and 102 because of the lack of intermediate handrails. He did not feel that the May 15, 1970 letter changed that requirement.
On cross-examination Mr. Junius stated that the width between the brick and the stairs was three inches. He conceded that the ball of Mrs. Bell's shoe would have been beyond the edge of the step and that would increase the probability of a fall. He noted the heel on Mrs. Bell's shoe was mushroomed from wear.
Jim Danner, a civil engineer retained by the defense, said the May 15, 1970 Board ruling authorized a variance from the New Orleans Building Code. Mr. Danner found two conclusions in the May 15th ruling: (1) that the Building Code would not be used and NFPA No. 102 would be applicable; (2) that the Board approved the exitways and stairways as designed. Mr. Danner noted that NFPA No. 102 had no provision for intermediate handrails and referred back to No. 101. Mr. Danner noted the exception in No. 101 for monumental outside stairs (requiring only two handrails). He said according to the NFPA sections handrails are mandated based on the required width of the stairs.
Mr. Danner found compliance if the steps were monumental stairs (since the requirement for two handrails was met) and were 32 inches high with a tread 10-½ inches *906 wide and a 7 inch riser. He measured the hole and found it to be two inches long and ½ inch wide. The hole tapered to 7/16 inch and the average width was 3/8 inch. Mr. Danner inspected the stairs on June 16, 1988 and could not determine if they were monumental outside stairs. Such a determination would require a fire exit study to determine what width of stairs was required for the number of people who were going to use the stairs.
Under the NFPA sections which were applicable due to the variance given by the New Orleans Board of Standards and Appeals, Mr. Danner concluded that the stairs met all of the requirements by the Department of Safety and Permits of New Orleans. The stairs had adequate handrails available which Mrs. Bell did not use. The hole was in the middle of the stairway 3 inches from the edge of the step and Mrs. Bell had to place her foot over the edge of the step for her heel to get stuck. Without a hole Mrs. Bell could have fallen without solid footing. Mr. Danner concluded Mrs. Bell's inattentiveness was the cause of the accident.
Bholanath Dhume, Chief Plan Examiner for the New Orleans Department of Safety and Permits, testified that his job was to assess applications for permits according to the New Orleans Building Code, to give advice to the Board of Building Standards and Appeals, and to write decisions for the Board. Mr. Dhume qualified as an expert in architecture and on the building code as applied to structures in the city. He testified that the May 15, 1970 ruling was a variance which applied to the entire Superdome project.
Mr. Dhume stated NFPA No. 102 did not require handrails and referred to No. 101, paragraph 5-3164d, which required intermediate handrails if the stairway was more than 88 inches wide. Paragraph 5-3164d provided for intermediate handrails if the stairway was more than 88 inches in width except for monumental outside stairs which required two handrails.
Mr. Dhume emphatically stated that intermediate handrails were only necessary on the required width of the stairs. He could not determine whether the stairs on which Mrs. Bell fell were required and not monumental stairs (an exception to NFPA No. 101, Paragraph 5-3164d) without making calculations based upon information as to how many people were expected to exit the building down a certain stairway. Mr. Dhume testified the record of the Board of Standards and Appeals does not contain that information although he felt it was presented to the Board before the Superdome permit was approved.
Mr. Dhume noted that Paragraph 2 of the Board's ruling allowed the exit to be built pursuant to the plans presented to the Board. Mr. Dhume did not have the plans and could not comment further; however, he said the Board okayed the plans after following appropriate procedures. Without additional information he could not state whether the stairway was monumental outside stairs or a required stairway.

SUPERDOME MAINTENANCE TESTIMONY
Ashton Stephens, Maintenance Supervisor at the Superdome, stated that he made periodic inspections of the tile and grout around the Dome. He said his tile setter and finisher, Carr and Trask respectively, made daily inspections and followed a schedule of preventative maintenance. They would circle the Superdome in a gas-powered cart and walk into places where they could not inspect from the cart.
Stephens testified that he learned of the alleged hole about a week or a week and a half after the accident. On cross-examination he said that if he had known of the hole, he would have had someone repair it. On redirect, he stated that it was possible his men repaired the hole between the November, 1986 game and the November, 1987 plaintiffs' inspection of the stairs.

BACKGROUND AND TRIAL COURT ACTION
Mary and James Bell sued under strict liability and negligence. In paragraph IX of their petition they alleged Mrs. Bell tripped on "an irregular and defective protrusion on one of the steps" and that subsequent *907 inspection revealed an "irregular raised edge on the steps and that said steps were improperly and dangerously constructed...." After inspection of the area in November, 1987 plaintiffs filed a supplemental petition in January, 1988 which amended paragraph IX to delete the reference to the protrusion and amended paragraph X to state that the steps were "improperly and dangerously constructed and maintained and that no intermediate handrails were provided" and that there was a large hole in the grout adjacent to the metal nosing at the top of the landing which presented an unreasonably dangerous condition.
The trial court rendered judgment in favor of the defendants and said in reasons for judgment:
The Court is of the opinion that the hole, which measured one and one-half inches by one-half inch (1½" × ½") did not constitute a defect in the premises which posed and [sic] unreasonable risk of harm to persons using the premises. Further, the Court finds no defect in the construction of the stairway either as a result of a variance of three-eights [sic] of an inch (3/8") in the riser height or from the failure to place one or more intermediate handrails in the stairway.
The Bells specify five errors:
(1) In finding the hole at the top of the concrete stairs did not constitute an unreasonable risk of harm;
(2) In finding that the failure to place one or more intermediate handrails in the stairway did not constitute a defect in the stairway;
(3) Failing to permit questioning calculated to show that the defendants were negligent;
(4) Failing to consider evidence of negligence and regarding the case as being solely one of strict liability;
(5) In failing to place the burden of proof upon the defendants once the plaintiffs had shown a defect that caused the injury.

THE LAW
In a negligence claim under La. C.C. art. 2315 against an owner of a thing which is involved in causation of the injury, the injured party must prove that something about the thing created an unreasonable risk of injury that resulted in the damage, that the owner knew or should have known of that risk, and the owner failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982).
To prevail on a strict liability claim under La. C.C. art. 2317, the injured party must prove that the thing which caused the damage was in the custody of the defendant, that the thing had a defect or vice (that is, that it occasioned an unreasonable risk of harm or injury), and the injury was caused by the defect. Loescher v. Parr, 324 So.2d 441 (La. 1975); Baker v. Sewerage and Water Board, 466 So.2d 720 (La. App. 4th Cir.1985).
The difference between the two theories is that under strict liability the claimant is relieved of proving that the owner knew or should have known of the unreasonable risk of injury created by the thing he owns. While the basis for determining the existence of the duty is different in strict liability and in ordinary negligence cases, the duty which arises is the same. Marziale v. Maney, 529 So.2d 504 (La.App. 4th Cir.1988), writ denied 533 So.2d 22 (La. 1988).
Under either theory the claimant must prove that under the circumstances the thing presented an unreasonable risk of harm which resulted in the damage, or stated another way, that the thing was defective. Kent v. Gulf States Utilities Company, supra; Marziale v. Maney, supra.
The unreasonable risk of harm criterion is not a simple rule of law which can be applied mechanically. It requires a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations. Landry v. State, *908 495 So.2d 1284 (La.1986); Entrevia v. Hood, 427 So.2d 1146 (La.1983).
To determine whether a risk is unreasonable, the court must balance the probability and magnitude of the risk against the utility of the thing. Hunt v. City Stores, 387 So.2d 585 (La. 1980). The probability of the harm posed plus the gravity of the harm which may ensue must be balanced against the utility of the thing in its condition on the date of the accident. The rights and duties of the parties must also be considered. Maltzahn v. City of New Orleans, 433 So.2d 417 (La.App. 4th Cir.1983); Carter v. Board of Supervisors of Louisiana State University, 459 So.2d 1263 (La.App. 1st Cir.1984), writ denied 462 So.2d 1248 (La.1985).

ANALYSIS
Ashton Stephens, maintenance supervisor at the Superdome, stated that his men regularly inspected the tile and grout around the Superdome. He stated that his men might have placed grout in the alleged hole prior to the inspection one year later. The hole found a year later might not have been in that condition on the day of Mrs. Bell's accident. It would be unrealistic to expect maintenance employees to find and immediately repair every tiny hole or missing grout in the stairs and walkways in a structure as large as the Superdome.
The trial court found no defect in the construction of the stairway which had a slight variance in the riser height and no intermediate handrails. There was expert testimony that a variance was granted from the Building Code relative to exits and stairways. Plaintiffs' expert, Ralph Junius, reached his conclusion that there was a violation of NFPA No. 101 (which he found applicable due to the variance) only by concluding that the stairway was a required exit.
The defense expert, Jim Danner, did not find a violation because he had insufficient information to determine whether the stairway was a required exit. Similarly, Bholanath Dhume, the chief plan examiner for the Department of Safety and Permits for New Orleans, found no violation because of the absence of intermediate handrails. He could not determine whether the steps were a required exit which would require additional handrails. Even plaintiff's expert, Ralph Junius concluded the slight variation in the riser and treads was not hazardous.
In making its determination the trial court applied the jurisprudential balancing test to decide that the small hole which allegedly caught Mrs. Bell's high heel did not constitute a defect which posed an unreasonable risk of harm to the general public who use the Superdome. There was ample testimony and evidence to support the lower court judgment.
We find no merit to appellants' first, second and fifth arguments.
Appellants argue that the trial court erred by curtailing questioning calculated to show the defendants' negligence. The only instance where the trial court interposed its objection to relevancy related to questioning of Ashton Stephens, the maintenance supervisor, as to the background, training and experience of two men in his employ. The trial court has much discretion deciding relevancy. We find no reversible error in that decision. Appellants' third argument has no merit.
Appellants' fourth argument that the trial court failed to consider evidence of negligence also lacks merit. Under strict liability or negligence the plaintiffs/appellants had to prove there was a defect in the premises, that the thing in its custody occasioned an unreasonable risk of harm to those using the Superdome. Under either theory that was the threshold question which the trial court answered in the negative.
The judgment is affirmed.
AFFIRMED.
NOTES
[1] Article 3305 of the New Orleans Building Code relating to Railings provides in pertinent part:

All stairways shall have walls, well secured balustrades, or guards on each side, and handrails shall be placed on at least one side of every stairway, preferably on the right descending. Stairways exceeding 44 inches in width shall have handrails placed on each side. Stairways over 7 feet wide shall be provided with one or more continuous intermediate handrails substantially supported, and the number and position of intermediate handrails shall be such that there is not more than 66 inches between adjacent handrails. Handrails and railings shall be placed 30 inches above the nosing of treads, and ends of handrails shall be returned to the wall.
[2] During questioning, counsel refers to the measurement of Jim Danner, the defense expert who testified by deposition that the width of the steps was 15 feet, 9 inches. Although counsel notes the distance between the handrails to be 15.9 feet or 190.8 inches, the Danner measurement referenced by counsel was 15 feet, 9 inches.