593 So.2d 731 (1992)
Faith McCULLOUGH
v.
REGIONAL TRANSIT AUTHORITY, Jane Doe, City of New Orleans, Department of Police, Warren G. Woodfork, in His Official Capacity as Chief of Police.
No. 90-CA-1720.
Court of Appeal of Louisiana, Fourth Circuit.
January 9, 1992.
Writ Denied April 3, 1992.
*733 Joseph W. Thomas, New Orleans, for plaintiff/appellant.
Frederick F. Olsen, Jr., Berrigan, Danielson, Litchfield, Olsen, Schonekas & Mann, New Orleans, for defendants/appellants, Regional Transit Authority, Transit Management of Southeast Louisiana, Inc. and Barbara E. Bell.
William J. Guste, Jr., Atty. Gen., Jesse J. Marks, Asst. Atty. Gen., Lois C. Davis, Asst. Atty. Gen., Louisiana Dept. of Justice, New Orleans, for defendant/appellee, State of La. Through the Dept. of Transp.
Philip C. Ciaccio, Jr., Deputy City Atty., Kathy L. Torregano, Chief Deputy City Atty., William D. Aaron, Jr., City Atty., New Orleans, for defendant/appellee, City of New Orleans.
Before BARRY, BYRNES and WARD, JJ.
BARRY, Judge.
This appeal is from a bifurcated personal injury trial. Plaintiff appeals the trial judge's dismissal of her claims against the Regional Transit Authority, the City and the State, and the reduction of her award. She argues that the jury's findings of fact are supported by the evidence. Defendants, Transit Management and Ms. Bell, the bus driver, answered the appeal and filed a separate appeal. They argue that the jury's verdict is contrary to the law and evidence and their motion for a judgment notwithstanding the verdict should have been granted.[1]

BACKGROUND
On September 12, 1987 Faith McCullough exited an RTA bus at the corner of St. Claude and Poland Sts., fell and was injured. On September 9, 1988 McCullough sued the bus driver, the Regional Transit Authority (RTA), Police Chief Warren Woodfork and the New Orleans Police Department. She alleged that she "fell as she attempted to exit the bus" because the bus could not get into the bus stop since a police vehicle was parked there. On May 31, 1989 McCullough filed a supplemental petition which named Barbara Bell as the bus driver and added as defendants Neil Wagoner and the Louisiana State Department of Transportation and Development (DOTD). The supplemental petition alleged strict liability based on a hazardous condition, i.e., the "presence of an abandoned railroad track on St. Claude Ave. at this particular intersection and the potential danger to their fare-paying passengers exiting a bus in the middle of the street especially on a wet day." On February 5, 1990 McCullough filed a second supplemental petition which added Transit Management of Southeast Louisiana, Inc., Ms. Bell's employer.
RTA, Transit Management and Bell (all represented by the same counsel) cross claimed against Chief Woodfork and the *734 City (NOPD) as well as Neil Wagoner and the State (DOTD). The City third partied RTA. The trial court granted defense motions to strike the jury as to Chief Woodfork, the City and State (DOTD), RTA, but not as to Wagoner. The Supreme Court struck the jury as to Wagoner because he was a nominal party against whom there was no allegation of personal fault. Chief Woodfork and Wagoner were dismissed on a directed verdict.
A jury heard the case against Bell and Transit Management and returned a verdict of $500,000 with fault apportioned as follows:

Bell and Transit Management: 10%
McCullough: 10%
City of New Orleans: 40%
State of Louisiana: 40%

Pursuant to La.R.S. 13:5105 the trial judge heard the case against RTA, the City and State and dismissed the matter as to those defendants. Based on the jury verdict holding Bell and Transit Management 10% liable, judgment was rendered in favor of Ms. McCullough for $50,000. Bell and RTA's motion for a judgment notwithstanding the verdict was denied.

STANDARD OF APPELLATE REVIEW
Generally, the findings of the judge or jury will not be disturbed unless they are manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). That standard is inapplicable in this case because there was a bifurcated trial which resulted in inconsistent findings of fact by the trial judge and jury.
The jury interrogatories were answered as follows:
1. Were Barbara Bell and/or Transit Management of Southeast La., Inc. negligent and was such negligence a cause in fact of harm to plaintiff?
 yes 
If # 1 is answered `no' stop here; if `yes' continue.
2. Was Faith McCullough guilty of contributory negligence which was a cause in fact of her own injuries?
 yes 
3. Assign a percentage of fault, if any, to each of the following:

a. Transit Management and/or
Barbara Bell: 10%
b. Faith McCullough: 10%
c. City of New Orleans: 40%
d. State of Louisiana: 40%

Added together, the percentages must total 100%.[2]
5. What general damages (pain, suffering, etc., past and future) and special damages (medical expenses, lost wages, diminished earning capacity, past and future) did plaintiff suffer as a result of this accident?
 $500,000
The trial judge dismissed RTA, the City and State for the following reasons:
Plaintiff said in deposition that she alighted adjacent to the bus stop sign. She said she felt gravel under her foot. She told several witnesses her legs had given way. She fell on the sidewalk side of the street curb. She did not even discover the presence of the steel end guard until more than a year after her accident. I conclude plaintiff did not slip on the end guard. The RTA discharged her in a reasonably safe location. The faded stripping, [sic] the end guard, and the car parked in the bus stop did not cause her to fall. Plaintiff's action against the RTA, the City, and the State will be dismissed.
In Thornton v. Moran, 343 So.2d 1065 and 1066 (La.1977), the Supreme Court made its only statement as to the applicable standard of review in bifurcated cases. The First Circuit had affirmed inconsistent conclusions of the judge and jury. The Supreme Court reversed the appellate court and remanded to the court of *735 appeal "to resolve the differences in the factual findings between the jury and the judge in these consolidated cases and to render a single opinion based upon the record." Id. at 1065.[3] That language has been utilized by the First, Third and Fourth Circuits to formulate two different approaches to review a bifurcated trial.
The First Circuit in Thornton (on remand), 348 So.2d 79 (La.App. 1st Cir.), writs denied and refused 350 So.2d 897, 350 So.2d 898, 350 So.2d 900 (La.1977),[4] declared that the appellate court must reconcile any differences in factual findings by determining which trier of fact was more reasonable in its conclusions. The reviewing court must harmonize the judgment(s). The First Circuit stated its function was to ascertain which trier of fact "accorded a more reasonable measurement to the evidence in reaching a decision...." Id. at 82.
The Third Circuit has followed a similar approach, i.e., the appellate court should consider the entire record and decide whether the factual conclusions of the trial judge or those of the jury are more reasonable. Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3rd Cir.1987), writs denied 522 So.2d 562 and 522 So.2d 563 (La.1988); Deville v. Town of Bunkie, 364 So.2d 1378 (La.App. 3rd Cir.1978), writ denied 366 So.2d 564 (La.1979). See also Hatcher v. State, DOTD, 478 So.2d 774 (La.App. 3rd Cir.1985), writ denied 479 So.2d 923 (La. 1985).
Utilizing the Supreme Court's mandate in Thornton, 343 So.2d at 1065, this Circuit has declared that the Supreme Court rejected any notion that the findings of the judge or jury are entitled to greater weight. The Fourth Circuit has held that an appellate court must make its "own independent factual findings based on the record, without according any weight to the factual findings of either the judge or the jury when those findings are inconsistent." Justin v. City of New Orleans Through Morial, 499 So.2d 629, 631 (La.App. 4th Cir.1986), writ denied 501 So.2d 232 (La.1987), quoting Aubert v. Charity Hospital of Louisiana, 363 So.2d 1223, 1227 (La.App. 4th Cir.1978), writ denied 365 So.2d 242 (La.1978). In Williams v. City of New Orleans, 433 So.2d 1129 (La.App. 4th Cir.), writ not considered 437 So.2d 1135 (La.1983), this Court noted the circuits' "divergence of views" as to the applicable standard of review. This Court declared that the Third Circuit's approach in Deville v. Town of Bunkie, 364 So.2d at 1378, was more in line with the First Circuit's "more reasonable measurement" standard of Thornton than that of this Circuit. This Court noted confusion in the Third Circuit because Deville cited Aubert (Fourth Circuit) and Thornton (First Circuit) as authority. Id.
This Circuit in Davis v. Visco's Inc., 380 So.2d 739 (La.App. 4th Cir.), writ denied 382 So.2d 167 (La.1980), generally cited Aubert, Deville and Thornton for authority to make its own independent findings based on the record, but quoted Aubert's language. In a concurrence in Smiley v. Sikes, 543 So.2d 1084 (La.App. 2d Cir.), writ denied 548 So.2d 326 (La.1989), Judge (now Justice) Hall stated there was little difference in the standards enumerated by the First, Third and Fourth Circuits because all circuits require an independent determination based on the record.
We disagree. Only the Fourth Circuit has required an independent review without according any weight to the factual findings of the judge or jury. Thus, a result different than the decision by the judge or the jury is possible. The other circuits merely decide whether the judge or jury made a more reasonable finding. Writs from First, Third and Fourth Circuit cases have been denied by the Supreme Court and the divergent opinions continue.
*736 The trial judge noted the confusion to the jury:
The law says the liability of the defendants, if you've got more than one, is borne between them.... Well, how do we do that if I'm trying one part and you're trying the other part and I'm not supposed to pay any attention to your verdict, who reconciles it, it's a wide open issue and I wanted you all to know that because that's what we've been doing in there, debating which way to go, and it's veryit's confusing. But we will stumble through it and one day we'll get a Supreme Court decision that will tell us how to do it then it will be done right. Until then, we've got to guess what they're going to do.
Appellate courts stretch to use the customary manifest error or clearly wrong standard if the judge has made no clear finding as to certain facts or the jury has based its conclusions on an incorrect legal premise. See Whittington v. Sowella Technical Institute, 438 So.2d 236 (La. App. 3rd Cir.), writs denied 443 So.2d 591 and 443 So.2d 592 (La.1983); Norris v. Bell Helicopter Textron, 495 So.2d 976 (La.App. 3rd Cir.1986), writ denied 499 So.2d 85 (La.1987).
Some appellate courts strain logic to declare that the jury's factual findings of liability as to a state agency have no legal effect and therefore create no factual conflict with a judge's determination of no liability as to the same defendant (even though apportionment of fault is affected). See Lasswell v. Matlack, Inc., 527 So.2d 1199 (La.App. 3rd Cir.), writs denied 532 So.2d 104 and 532 So.2d 153 (La.1988) (judgment notwithstanding the verdict granted); Dean v. Terrebonne Parish Police Jury, 510 So.2d 82 (La.App. 1st Cir. 1987) (judgment notwithstanding the verdict granted); Rogers v. Calcasieu Police Jury, 487 So.2d 190 (La.App. 3rd Cir.), writ denied 489 So.2d 924 (La.1986); Bishop v. Shelter Insurance Company, 461 So.2d 1170 (La.App. 3rd Cir.1984), writ denied 465 So.2d 737 (La.1985). This Court has disagreed with such reasoning. If the factual findings are inconsistent, we make an independent evaluation of the record. Nunez v. St. Bernard Parish Fire Department, 519 So.2d 857 (La.App. 4th Cir.1988).
This case presents inconsistent findings of fact. The judge found no liability as to RTA because Ms. McCullough was discharged in a reasonably safe location and she fell on the sidewalk side of the curb. The judge also found no liability as to the City and State. He concluded Ms. McCullough did not slip on the steel guard, nor did the faded crosswalk striping or the car allegedly parked in the bus stop cause her to fall. Apparently the jury found the bus driver and Transit Management liable because Ms. McCullough was not safely discharged from the bus (although no jury interrogatory or answer states the reason for liability). The jury found the City and the State each 40% liable.
We will make an independent review of the facts based on the record.

FACTS
Faith McCullough was a computer programmer at the Naval Reserve Personnel Center on Dauphine St. for 9-½ years. She testified that on Saturday morning, September 12, 1987 she was on an RTA bus going to work and was in a first row seat behind the driver. She signaled to get off the bus at the corner of Poland and St. Claude. The weather was misty and drizzly and the streets were wet. She was wearing black "slip-on slippers" with rubberized soles.
Ms. McCullough said the bus driver could not pull to the curb at the bus stop and drove "a little beyond it," about "[t]welve feet or so" and stopped on an angle. She was told after the accident that a police car was parked in the bus stop area. She did not see the police car that day, but on prior days she had seen police vehicles in the bus zone during the change of shifts at the station.
Barbara Bell, the driver, testified on cross-examination that she had been a bus driver for only a few days at the time of the accident. She said that no police car was in the bus stop, which differed from her deposition. She attempted to clarify by *737 saying that the police car was not in the bus zone area where she had to drive the front of the bus. She said it was parked "dwon [sic] from the bus stop, that I couldn't pull the whole bus in that area in order to drop off my passengers...." She said the front of the bus was toward the curb and the back was at an angle in the street.
Ms. McCullough stated that she exited the bus shortly after 7:30 a.m. through the front door. She was carrying a tote bag on her left shoulder. She put her left foot on the ground, her right foot was on the bottom step of the bus, and her right hand was on the rail. She said that suddenly both feet were in the air and her buttocks were on the ground. At first she said that she fell down on "the curb", then she stated that she was not able to step from the bus to the curb which was a couple of steps away. Later she said that her right foot never touched the ground before she fell. Ms. McCullough said she stepped on "pavement" and "loose gravel" that was "moist" and "slick", but later learned it was a metal strip.
During cross-examination Ms. McCullough stated: "I knew that my feet slipped, I felt gravely [sic] stuff under my feet, my left foot, and I knew that my right foot slipped." She did not remember if she looked down when she got off the bus. She claimed that she had never fallen during 9-½ years of riding the bus to work.
Defense counsel showed Ms. McCullough the ambulance attendant's report which stated that "pt [patient] was stepping off RTA bus when she slipped on sidewalk edge hurting her knees and lower back." She retorted that the attendant did not obtain that information from her. Defense counsel also produced her United Medical Center Emergency Department chart on which a registered nurse noted that a 49-year-old white female who complained of "slipping on sidewalk when she stepped off a bus and landing on buttocks." Ms. McCullough denied telling a nurse that information.
Counsel also confronted Ms. McCullough with her negative answer to interrogatory #11 which requested information on any previous back problem. Ms. McCullough stated that she did not remember that interrogatory or she did not understand the question. On direct examination she had testified that she had a disk removed around 1970, but was able to go back to work. In 1974 another disk was removed and in 1975 she underwent a fusion but returned to work.
Defense counsel sought to impeach Ms. McCullough's trial testimony as to the bus' location by using her deposition taken on March 7, 1989. At trial she denied having said the bus stopped almost even with the bus stop sign. Counsel read Ms. McCullough's deposition in which she said the bus stopped "approximately four feet from the curb, the door was almost directly in front of the little pole that says bus stop." At trial she attempted to explain that in her deposition she referred to the back door. However, there was no reason to refer to the back door. When Ms. McCullough was asked whether she mentioned the steel beam in the street at the time of her deposition, she answered that she did not know if she had been asked.
Counsel asked whether the original petition filed in September, 1988 mentioned a steel beam and Ms. McCullough stated that she did not know. She acquiesced in counsel's statement that the beam was not mentioned until the amended petition was filed in June, 1989.
Ms. McCullough admitted that there was no mention of a beam in her previous deposition testimony and when asked what caused her fall she said: "I'm not real positive." At first she explained that she inspected the street and discovered the steel beam about a month after the accident. Counsel referred to her deposition which was taken about 1-½ years after the accident. Ms. McCullough then said she discovered the beam after the deposition and realized it caused her to fall.
Ms. Joanne Toscano, Ms. McCullough's supervisor at the Naval Reserve Personnel Center, went to the hospital on the day of the accident and testified: "Faith said I was getting off the bus. I had a purse in *738 one hand and cup of coffee in the other and when I stepped down my legs went out from under me."
Ms. McCullough had spoken to Anthony Anderson, a Charity Hospital L.P.N. who was riding the bus and left the bus to help her. Anderson testified as to what Ms. McCullough said: "She told me as she was stepping up on the curb, her leg just kind of gave way."
Anderson said the bus stopped "a little forward to the bus stop" and a passenger had to step into the street before reaching the curb. He stated that "a plain, white car" was next to the bus. He said he did not remember the weather.
Anderson did not witness the fall, but saw Ms. McCullough on the ground "[r]ight above the bus stop." She was "one, two steps at the most" from the bus stop sign and her upper body was on the metal curb and her legs were in the street. On the diagram in evidence he placed Ms. McCullough very close to the bus stop sign and a distance from the steel beam in the street.
Ms. McCullough's counsel asked Anderson to return to the site and locate the beam, and he said: "The steel beam that I seen her, where she was resting against the curb, that goes around the street itself." That describes the steel curb. Anderson would not say that Ms. McCullough fell on the steel beam in the street.
At the time of the accident, several police officers were standing in front of the police station. Officer Smith testified that he was facing the bus and saw that it stopped at an angle because an unmarked vehicle was "parked right in front" of the police station. The front door of the bus was "a few feet past" the bus stop sign. The street was dry. He saw Ms. McCullough get off the bus, take two or three steps, then fall "on the sidewalk, the grass area." According to Officer Smith's initials on the diagram, Ms. McCullough fell between the curb and sidewalk.
Officer Irving testified that she saw a female get off the bus which stopped on an angle to the curb because of a parked vehicle. The street was damp. Officer Irving turned around for a minute, then saw a woman on the ground shouting for help. She testified that Ms. McCullough fell beyond the location of the waste basket which was in front of the bus stop sign. Officer Irving's initials on the diagram show Ms. McCullough was between the curb and sidewalk. She said part of Ms. McCullough's body was on the grass and part of her body was on the cement by the curb. She also saw a black man exit the bus.
During Officer Irving's deposition she made a diagram which placed Ms. McCullough closer to the corner between the curb and sidewalk. The officer said she thought about the accident after the deposition and was more certain at trial that Ms. McCullough fell on the sidewalk. She stated that the vehicle parked in the bus stop was not a marked police car. According to Officer Irving the diagram used at trial better depicted the scene.
Officer Evans testified that he saw Ms. McCullough on the ground between the curb and the sidewalk, not in the street. He marked and initialed the diagram.
Petty Officer Douglas Storms, Ms. McCullough's co-worker who was at work, drove to the accident scene after the police called. Ms. McCullough was lying in "the bare dirt area of the corner." On a photograph and the diagram, Petty Officer Storms indicated that Ms. McCullough was past the waste basket but between the curb and the sidewalk, not in the street.
Ms. McCullough submitted a video tape and transcript of the deposition of Billy Crouch, a National Weather Service meteorologist who testified that there was heavy fog on the morning of the accident and the streets would have been wet.
Dorothy Jacobs Loupe, a professional photographer, testified she took photographs of the location on May 19, 1989 and a video in December, 1989. The video depicts a bus picking up passengers at Poland and St. Claude with Ms. McCullough's counsel's car parked in the bus stop.
*739 Stephen Estopinal, Ms. McCullough's engineering and surveying expert, testified that St. Claude Ave. is La. Hwy. 46, owned by the State and maintained by DOTD. He surveyed the location in January, 1990 and prepared the map which was initialed by the witnesses to indicate Ms. McCullough's position. The street is asphalt, the bus stop pad is concrete, and the steel beam is at the end of the concrete bus pad in the intersection and is partially covered by asphalt. The beam is visible between faint double white lines marking the pedestrian crosswalk. The bus stop sign was 12 to 13 feet from the end of the concrete bus pad and the curb was 6 inches high. Estopinal testified there was loose aggregate (gravel and sand) by the beam and it would be slippery if wet. He said the beam is no longer necessary because expansion joints are used now and it should have been removed when the street was resurfaced.
Robert Roth, DOTD maintenance engineer, testified that DOTD was responsible for the maintenance of St. Claude. He said the steel beam was also referred to as an end dam. It was embedded in the concrete to protect the corner of the concrete slab and served as an expansion joint.
Roth's deposition testimony was that the beam was an abandoned railroad or streetcar track. He explained that he went to see the accident site after his deposition and observed that an "end dam" was in the street. Ms. McCullough's counsel used Mr. Roth's second deposition wherein he said the end dam served no purpose. Roth reiterated at trial that the beam is not necessary. Roth concluded that removal of the beams would require removal of large portions of the roadways, and would be time consuming, expensive, and require closing a traffic lane for a long time. Roth stated he saw no reason for loose gravel to accumulate in the end dam.
Roth said the State was responsible for maintenance and crossmarkings, but had received only one complaint (April 21, 1987) which involved the other side of St. Claude. Although the beam was present for many years, Roth did not know if anyone at DOTD knew of its presence.

LAW AND ANALYSIS
Under strict liability pursuant to La. C.C. art. 2317, the claimant must prove that the thing which caused the damage was in the care or custody of the defendant, that the thing had a vice or defect which caused an unreasonable risk of injury, and the injury was caused by the defect. Crowell v. City of Alexandria, 558 So.2d 216 (La. 1990); Riche v. City of Baton Rouge, 515 So.2d 765 (La.1987); Shipp v. City of Alexandria, 395 So.2d 727 (La.1981).
However, La.R.S. 9:2800B limits the strict liability of a public entity such as the State, the City and RTA. It provides in pertinent part:
[N]o person shall have a cause of action based solely upon liability under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
Under La.C.C. Art. 2315 the claimant must additionally prove that the owner knew or should have known of that risk. Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982). Under either Arts. 2315 or 2317 the claimant must prove a defect and that the thing presented an unreasonable risk of harm which resulted in damage. Causation must be proven. Bell v. State, 553 So.2d 902 (La.App. 4th Cir.1989); Marziale v. Maney, 529 So.2d 504 (La.App. 4th Cir.), writ denied 533 So.2d 22 (La.1988).
A common carrier is held to the highest degree of care and the slightest negligence causing injury to a fare-paying passenger will result in liability. However, a common carrier (such as RTA) is not absolutely liable for the safety of its passengers. It is not the insurer of its passengers' safety. Smith v. Regional Transit Authority, 559 So.2d 995 (La.App. 4th Cir.), writ denied 566 So.2d 986 (La.1990); *740 Favorite v. Regional Transit Authority, 552 So.2d 487 (La.App. 4th Cir.1989). When there is proof of injury to a fare-paying passenger on a public conveyance and the failure to reach his/her destination safely, the burden shifts to the carrier to show it is free from negligence and to overcome the prima facie case. Galland v. New Orleans Public Service, Inc., 377 So.2d 84 (La.1979); Sickinger v. New Orleans Public Service, Inc., 524 So.2d 93 (La.App. 4th Cir.1988).
A public carrier is not negligent by failing to stop its bus adjacent to the curb. The negligence test involves whether the place where the passenger is compelled to exit is reasonably safe. Payton v. NOPSI, 270 So.2d 318 (La.App. 4th Cir.1972); Cary v. NOPSI, 250 So.2d 92 (La.App. 4th Cir.), writ refused 259 La. 808, 253 So.2d 67 (La.1971).
The issue is what caused Ms. McCullough to fall. She said in a deposition (March 7, 1989) that loose gravel on the street caused her to fall toward the curb, and the roadway was moist and slick.
The ambulance attendant's report, the nurse's entry on the emergency department chart, and the testimony of Ms. Toscano and Mr. Anderson all show that Ms. McCullough slipped near the bus stop sign by the sidewalk, or on the curb, or her legs "gave way" sometime after she got off the bus.
Ms. McCullough was wearing "slip-on slippers" and testified that she could not remember if she looked down as she got off the bus. She said she did not move after she fell. Petty Officer Storms placed her position closer to the corner, but on the sidewalk side of the curb.
The evidence does not support Ms. McCullough's claim that she slipped on the steel beam in the street. The fact that she did not mention the steel beam until almost two years after the accident and months after her deposition persuades this Court (as it did the trial judge) that the steel beam did not cause Ms. McCullough to fall.
The allegedly illegally parked car did not contribute to Ms. McCullough's fall because the bus was able to pull close to the curb at an angle. Only Ms. Bell said that a police car was parked in the area, but not in the bus zone. There is no basis to hold the City or State liable.
There was no evidence that the bus driver was negligent. She stopped the bus as close as possible to the curb and near the bus stop sign. We find no liability as to Ms. Bell, RTA and Transit Management.
In summary, the record shows that Ms. McCullough exited the bus safely. If her fall shifted the burden to RTA and Transit Management, we are satisfied that the defendants carried their burden by showing that the bus stopped in a reasonably safe place.
We note that a disparity between the verdicts of the judge and jury in a bifurcated trial "can be accommodated by a judgment notwithstanding the verdict...." Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308, 1310 (La.1984). The trial judge "can restructure the jury decision so that it best reflects the law and the facts." Id. The trial judge could have resolved the disparity between his findings of no liability as to RTA, the City and the State and the jury verdict apportioning fault to Transit Management and the other defendants by granting the defendants' motion for a judgment notwithstanding the verdict. The motion was denied without a specified reason. In light of our determination of fault, we need not reach the defendants' separate argument as to whether a judgment notwithstanding the verdict should have been granted.
That part of the judgment which dismisses the State, the City and RTA is affirmed. The judgment as to the liability of Ms. Bell and Transit Management is reversed.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.
NOTES
[1] We note that the petition and order for appeal filed by Ms. Bell and Transit Management lists the March 19, 1990 judgment and the May 11, 1990 denial of the JNOV, then requests an appeal from "the judgment rendered on March 19, 1990". Their answer to Ms. McCullough's appeal does argue that the court should have granted the motion for a judgment notwithstanding the verdict.
[2] The jury interrogatories did not mention RTA although the City and State were listed. McCullough alleged similar negligence as to RTA and Transit Management but was evidently confused as to their liability. She did not add Transit Management until a supplemental petition was filed over two years later. RTA's motion to strike the jury was granted, but it is not clear that the liability of RTA was being separately decided by the judge while the jury decided the liability of Transit Management. The judge told the jury: "It's true the City and the State are being tried to me and the liability of RTA or Transit Management or whatever it is, is being tried to you.... Now you're only trying one, RTA, I'm trying two...."
[3] Justice Summers dissented from the "ex parte in chambers reversal of the judgment of the court of appeal without a hearing...." Justices Dennis and Calogero opined that the writ should have been granted, oral argument scheduled and an opinion rendered.
[4] In denying writ no. 60340 the Supreme Court declared: "The result is correct." In refusing writ no. 60334 the Court stated: "The result is correct." In refusing writ no. 60342 the Court stated: "No error of law."