798 So.2d 1032 (2001)
FIRSTAR COMMUNICATIONS OF LOUISIANA, L.L.P.
v.
TELE-PUBLISHING, INC.
Firstar Communications of Louisiana, L.L.P.
v.
Tele-Publishing, Inc.
Nos. 2000-CA-2219, 2000-CA-2220.
Court of Appeal of Louisiana, Fourth Circuit.
August 29, 2001.
*1033 E. John Litchfield, Kathy Lee Torregano, Berrigan, Litchfield, Schonekas, Mann, Traina and Thompson, LLC, and Clarence J. Dubos, III, New Orleans, LA, Counsel for Plaintiff/Appellant.
Marie Healey, Daniel A. Smith, Healey & Smith, New Orleans, LA, Counsel for Defendant/Appellee.
Court Composed of STEVEN R. PLOTKIN, MICHAEL E. KIRBY, and MAX N. TOBIAS, Jr., Judges.
TOBIAS, Judge.
In this contract action, plaintiff, Gambit Communications, Inc. (formerly Firstar Communications of Louisiana, L.L.P.) ("Gambit"), appeals the judgment rendered in favor of defendant, Tele-Publishing, Inc. ("TPI"), on its reconventional demand. TPI answers the appeal, asking this court to set aside an earlier summary judgment rendered in Gambit's favor and increasing the damages awarded by the court below.
Gambit is a Louisiana corporation that publishes a weekly newspaper in New Orleans called Gambit Weekly. TPI is a Massachusetts corporation that licenses publishers such as Gambit to use an interactive telephone communications system in connection with their "personals" advertising sections. Gambit contracted with TPI from 1992 through May 1996 to use TPI's system for "voice personals."
The TPI system generated revenue for both parties when Gambit readers responded to "personals" ads in the newspaper by dialing a "1-900" telephone number. TPI's long distance carrier, AT & T, collected tolls from the callers and remitted funds to TPI monthly, after subtracting various costs. TPI then subtracted *1034 certain additional costs as set forth in its contract with Gambit, and remitted an agreed-upon percentage of the balance to Gambit on a monthly basis, along with a statement and accounting of all revenue and costs. TPI was required to pay Gambit monies due for each month within five days of TPI's receipt of its gross revenues and monthly accounting from AT & T.
The parties signed the contract at issue on 22 May 1995. The contract specified an "effective date" of 1 May 1995, with an initial term of "twelve operating months." The contract defined the first "operating month" as the "first full month during which the System is operational." The contract provided for automatic renewal for another twelve "operating" months, unless either party notified the other of its intention not to renew the contract at least 60 days prior to the expiration of the initial term. A written notice of termination was not required. The contract did not specify an expiration date.
On 21 March 1996, Gambit sent a written notice to TPI stating that it would not renew the contract for the "96-97 term." On 29 March 1996, TPI responded with a written offer for a new contract with substantially better terms for Gambit, including a higher share of the revenues and various levels of improved service. Gambit did not accept the offer, but continued to perform under the contract by publishing TPI's "1-900" number. Thus, TPI received its monthly revenues from AT & T because of calls generated by Gambit's readers.
After receiving Gambit's 21 March 1996 termination notice, TPI stopped sending Gambit the required monthly statements and withheld its share of revenues received from AT & T totaling $31,843.64 for March through May 1996. TPI also began assessing Gambit a "bad debt withholding" fee, which was not provided for in the contract and had never previously been charged. Gambit signed a "voice personals" contract with a new provider on 22 May 1996, and ceased doing business with TPI.
Gambit filed two lawsuits against TPI: one for declaratory judgment terminating the contract and the second for payment of monies owed under the 1995 contract. TPI answered the petition for declaratory judgment, and included a reconventional demand, seeking compensation for lost profits for Gambit's alleged breach of the automatically renewed contract. Gambit answered the reconventional demand.
On 6 November 1997, Gambit moved for summary judgment to recover the revenues owed under the 1995 contract, which TPI opposed.[1] After hearing Gambit's motion, the trial court granted summary judgment on 2 February 1998, awarding Gambit $31,843.64. In the reasons for judgment, the trial court concluded that: (1) the language of the contract was ambiguous and should be construed against the drafter, TPI; (2) the effective date of the contract was 1 June 1995 as that was the first full month the system operated under the contract; (3) Gambit timely terminated the contract; and (4) TPI breached the contract.
TPI appealed the partial summary judgment. This court, however, dismissed the appeal, recognizing that TPI's reconventional demand was never resolved and that the record did not evidence compliance with La. C.C.P. art. 1915(B). See Firstar Communications of Louisiana, L.L.P. v. *1035 Tele-Publishing, Inc., 98-1816, 98-1817 (La.App. 4 Cir. 3/17/99), 732 So.2d 89.
The matter returned to the trial court for further proceedings.[2] On 24 June 1999, a bench trial was held on TPI's reconventional demand.
On 22 March 2000, the trial court declared that the contract was not effectively terminated. In the reasons for judgment, the trial court held that: (1) the effective date of the contract was 1 May 1995, although it was not signed until 22 May 1995; (2) the first full month of the system's operation was May 1995; (3) notice of cancellation was due on or before 28 February 1996; and (4) Gambit's cancellation notice dated 21 March 1996 was submitted after the contract automatically renewed for another twelve-month period.
Thereafter, on 11 May 2000, the court issued an amended judgment wherein it entered judgment in favor of TPI on its reconventional demand and awarded it $4,919.36.[3]
Gambit timely perfected its appeal objecting to the judgment in TPI's favor. Gambit argues that the "law of the case" doctrine provides that the first judgment is binding on the court during later stages of the trial and, therefore, the second inconsistent judgment must be vacated. In the alternative, Gambit argues that it is entitled to judgment on the merits for the reasons stated by the court when it ruled upon the motion for summary judgment. TPI answered the appeal, asking the court to reverse the summary judgment entered against it and increase the damages awarded on the reconventional demand. It argues that the law of the case doctrine is inapplicable because the first judgment was never final and that the second court erred in its calculation of damages by ignoring the uncontroverted evidence that its losses exceed $44,000.00.
Before turning to the merits of this appeal, we must address the unusual posture of this case and the applicable standard of review. Obviously, the two judgments entered by the lower court conflict: the first, granting summary judgment, holds that the contract was effectively terminated; the second, rendered after trial on the merits, holds that it was not. We review summary judgments de novo. Daniel v. Blaine Kern Artists, Inc., 96-1348 (La.App. 4 Cir. 9/11/96), 681 So.2d 19, writ denied, 96-2463 (La.12/6/96), 684 So.2d 934. Conversely, our review of factual findings is governed by the manifest error-clearly wrong standard. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). For purposes of this appeal, we have determined that the applicable standard of review is manifest error-clearly wrong in light of the subsequent trial on the merits of the reconventional demand.[4]
We also reject Gambit's reliance on the "law of the case" doctrine in the instant case. Typically, the law of the case *1036 doctrine applies to previous decisions of an appellate court on a particular issue, not to decisions of the trial court. See Tsatsoulis v. City of New Orleans, 99-2544 (La.App. 4 Cir. 8/30/00), 769 So.2d 137. Here, the summary judgment, though a partial final judgment, did not obtain the force of a final judgment under La. C.C.P. art. 1915, due to the parties failure to follow that statute. Thus, we adhere to our decision to apply the manifest error-clearly wrong standard.
TPI drafted the contract in question, which is dated 1 May 1995. It is undisputed that the parties signed it on 22 May 1995. The contract expressly provides that Massachusetts law shall govern its construction.
Massachusetts law provides that the interpretation of a written contract is a question of law. Lexington Insurance Co. v. All Regions Chemical Labs, Inc., 419 Mass. 712, 713, 647 N.E.2d 399, 400 (1995). Further, when the words of a contract are clear, they alone determine the meaning of the contract. But when a contract term is ambiguous, its import is ascertained by the parties' intent as manifested by the contract's terms and the circumstances surrounding its creation, such as relationship of the parties, actions of the parties, and established business usages. Merrimack Valley National Bank v. Baird, 372 Mass. 721, 723-24, 363 N.E.2d 688, 690 (1977). Generally, a writing is construed against the author of the doubtful language, if the circumstances surrounding its use and the ordinary meaning of the words do not indicate the intended meaning of the language. Id. at 724, 363 N.E.2d at 690. The author of the ambiguous term is held to any reasonable interpretation attributed to that term which is relied on by the other party. Id. at 724, 363 N.E.2d at 690-91.
Under the law of Massachusetts, the language of a contract need not be ambiguous on its face in order that extrinsic evidence may be admitted.
When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms.
Robert Indus., Inc. v. Spence, 362 Mass. 751, 753-54, 291 N.E.2d 407 (1973).
Finally, it is well established in Massachusetts jurisprudence that a material breach by one party excuses the other party from further performance under the contract. Quintin Vespa Co. v. Construction Serv. Co., 343 Mass. 547, 554, 179 N.E.2d 895 (1962). See also Restatement (Second) of Contracts, §§ 241-43 (1981).
The record indicates that the parties have executed three different contracts since 1992. The first, signed on 18 March 1992, reflects an effective date of 18 March 1992, and was for a term of twenty-four months. The second was signed on 30 March 1994 and became effective on 1 April 1994. It provided that it "commenced" on the date the Agreement became effective and would continue for twelve "operating months." It provided for an automatic renewal unless either party notified the other at least 60 days before the expiration of the "initial term" or 30 March 1995.
The third contract, which is at issue here, has an effective date of 1 May 1995, but was not signed until 22 May 1995. The clause in dispute provides as follows:
2. TERM. The term of this Agreement and the license granted hereby shall commence on the date this Agreement is effective and shall continue thereafter for a period of *1037 twelve operating months (the "Initial Term"). The first operating month shall be the first full month during which the System is operational. At the conclusion of the Initial Term, this Agreement shall automatically continue thereafter for successive periods of twelve operating months each (the "Extended Term") unless either party notifies the other at least sixty days prior to the expiration of the initial term or any annual anniversary thereof of its intention to cancel this Agreement as of the expiration of such initial term or any annual anniversary, as the case may be. This Agreement replaces any other Agreements previously signed by the parties.
The pivotal issue in this case is whether the 22 May 1995 contract automatically renewed before Gambit's written notice of termination of 21 March 1996. This court concludes that, under the facts and the applicable law, it did not.
First, although TPI did not enforce the automatic renewal provision of the 1994 contract (requiring an additional term of twelve operating months under its terms), a new contract was not signed until almost two months after its initial term expired. Thus, we find that until the contract was signed on 22 May 1995, the parties were operating under the 1994 contract. The language contained in Paragraph 2 supports this conclusion: "This Agreement replaces any other Agreements previously signed by the parties." If the 1994 contract was not still in effect on 22 May 1995, this language would be completely unnecessary. An interpretation which gives a reasonable meaning to all of the provisions of a contract is preferred to one that leaves a part useless or inexplicable. S.D. Shaw & Sons, Inc. v. Joseph Rugo, Inc., 343 Mass. 635, 640, 180 N.E.2d 446, 449 (1962).
We further find that Paragraph 2 is ambiguous. In drafting the contract, TPI did not specify an expiration date. Instead, the contract has a term of "twelve operating months." The contract defines the first "operating month" as the "first full month during which the System is operational." (Emphasis added.) As we have already held that the 1994 contract was in effect until 22 May 1995, the date the new contract was signed, the first full month the system operated under the 1995 contract was June 1995.[5] Therefore, the deadline for a notice of termination by either party was 1 April 1996.
TPI argues that because the system had been installed during the term of a prior agreement, it was fully "operational" the first month of the new agreement in May 1995. To apply this interpretation would render the majority of Paragraph 2 meaningless. Again, we must interpret the contract in such a way as to give a reasonable meaning to all of its provisions. S.D. Shaw & Sons, Inc., 343 Mass. at 640, 180 N.E.2d at 449. Consequently, we must look to see when the contract changes went into effect. While Gambit received an increase in revenues, from 80% to 85% in October 1995, retroactive to May 1995, the rate increase for the cost of calls did not become effective until mid-May 1995.
*1038 In addition, the evidence shows that Gambit put TPI on notice through oral communications before 1 March 1996 that it would not be renewing the contract. Despite this knowledge, TPI never informed Gambit after 1 March 1996 that the contract had automatically renewed. In fact, an internal TPI e-mail from Diane Dill to Paul Twichell of 19 March 1996 demonstrates that TPI was well aware that Gambit believed 21 March 1996 was the last date it had to give formal notice that it would not renew the contract. Despite this knowledge, TPI's policy was not to bring this to the customer's attention. Further, once TPI received Gambit's 21 March 1996 termination notice, it responded eight days later with an offer of a more favorable contract. Only after Gambit failed to reply did TPI inform Gambit that the cancellation notice was untimely and withheld Gambit's revenues for March, April, and May 1996.
TPI defends its action by arguing that Gambit had already breached the contract by announcing that it would not permit the automatic renewal to take place. However, Gambit continued to honor its obligations until 22 May 1996; it was TPI first that committed a material breach of the 1995 contract by withholding the revenues it admits it owed in March 1996 and thereafter. Thus, even if we held that the contract automatically renewed, we find under Massachusetts law, the material breach by TPI relieved Gambit of any further performance. Consequently, we hold that the trial judge who tried TPI's reconvention erroneously interpreted and applied Massachusetts law. We therefore set aside the judgment on the reconventional demand.
Accordingly, we find that Gambit timely terminated the 1995 contract before its automatic renewal provision took effect. We also find that TPI wrongfully withheld Gambit's revenues for March, April, and May 1996 and assessed Gambit a bad debt withholding fee without justification. Thus, we hold that Gambit is entitled to judgment in the amount of $31,843.53, plus judicial interest from date of judicial demand, until paid, as well as all costs of these proceedings. Finally, because Gambit timely terminated the contract, TPI is not entitled to recover on its reconventional demand and thus the judgment entered on 11 May 2000 is reversed.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.
NOTES
[1] Shortly after the motion was filed, a class action case went to trial in Division "F," where the instant case was pending and all other Division "F" cases were assigned to the judge in Division "J."
[2] While on appeal, the class action terminated and all cases that had been assigned to Division "J" were returned to the original judge in Division "F."
[3] This amount reflects an offset against the damages awarded to Gambit on its motion for summary judgment.
[4] We recognize that an analogous situation is found in instances where inconsistent verdicts arise from a bifurcated trial where this court has held that an appellate court must make its "own independent factual findings based on the record, without according any weight to the factual findings of either the judge or the jury." McCullough v. Regional Transit Authority, 593 So.2d 731, 735 (La.App. 4 Cir. 1992). However, because we find that the trial judge who tried the reconvention was clearly wrong in the interpretation and application of Massachusetts law, the result here is the same.
[5] This finding is supported by the tear sheets which show that for the week of 25 April1 May 1995, the parties were operating under the 1994 contract which provided for a cost of $1.50 per minute. In addition, the tear sheet for the week of 2 May8 May, shows both the 1994 price of $1.50 per minute and the 1995 price of $1.65 per minute. Thus, May 1995 was not the first full month the system was operational under the 1995 contract as at least on 1 May 1995 the parties were operating under the previous year's contract.