901 So.2d 619 (2005)
Harold SEVIN, Sr., Angela Sevin and Harold Sevin, Jr.
v.
PARISH OF PLAQUEMINES and State of Louisiana.
No. 2004-CA-1439.
Court of Appeal of Louisiana, Fourth Circuit.
April 27, 2005.
Rehearing Denied May 31, 2005.
*620 J.J. McKernan, McKernan Law Firm, Kirby J. Guidry, Guidry Law Firm, Baton Rouge, LA, for Plaintiffs/Appellees.
Charles C. Foti, Jr., Attorney General, Marjorie G. O'Connor, Assistant Attorney General, LA Department of Justice, Litigation Division, Baton Rouge, LA, for Defendant/Appellant.
(Court composed of Judge PATRICIA R. MURRAY, Judge JAMES F. McKAY, III, Judge DENNIS R. BAGNERIS, SR., Judge DAVID S. GORBATY, Judge EDWIN A. LOMBARD).
DAVID S. GORBATY, Judge.
The State of Louisiana appeals a judgment whereby it was found to be 65% liable for damages incurred by the Sevin family. For the following reasons, we vacate the trial court judgment and render.

FACTS AND PROCEDURAL HISTORY:
On July 25, 1995, Leona Sevin and two of her sons drowned in the Mississippi River near Fort Jackson in Plaquemines Parish. According to testimony, the family had been to this area before and observed others wading in the shallow water. However, the family was not aware of a sharp drop-off approximately 50 feet from the water's edge. The depth of the water increased at the drop-off from about 3 ½ feet to 10 feet. According to the testimony of Angela Sevin, an adult with the mentality of a 12-year-old, she watched her brothers wading in the shallow water. Her mother was also wading but stayed nearer to the shore. She suddenly saw her brothers disappear under the water, and her mother run to them. When her mother started running to the boys, Angela ran back across the levee to where a man was fishing. Richard Jones, a local resident, returned to the site and located the bodies. Unfortunately, he was unable to resuscitate any of the three victims.
Plaintiffs, the surviving members of the Sevin family, filed suit against the State of *621 Louisiana and the Parish of Plaquemines[1] (hereinafter "the Parish"). They alleged that the Parish owned and/or maintained the "beach" near where the accident occurred, and that the "beach" was a popular destination for swimmers during the summer months. No signs were posted warning of the dangers of swimming in the river. Plaintiffs alleged that the Parish was negligent for failing to erect signs warning of the dangers of swimming in the river and/or designating the beach as a "no swimming" area, and for failing to provide lifeguards and lifesaving equipment at the "beach." Alternatively, plaintiffs alleged that the State owned the "beach" and was liable for the same acts of negligence as the Parish. The combined fault, negligence, and/or strict liability of both defendants caused plaintiffs' damages.
On January 14 and 15, 2003, the case against the State was tried to a 12-person jury; the case against the Parish was tried to the bench. The jury returned a verdict in favor of plaintiffs, assessing fault to the State at 41%, fault to the Parish at 37% and fault to Leona Sevin at 22%. After the jury verdict was read, the State reurged the defense of immunity pursuant to La. R.S. 9:2795, the recreational use immunity statute. The trial court set a hearing on the matter for January 27, 2003. After the hearing, the trial court took the matter under advisement. On January 13, 2004, the trial court rendered a judgment finding the Parish free from fault, and reallocated the 37% of fault assessed by the jury proportionately between the State and Leona Sevin.
In addition to the above judgment, the trial court also rendered a judgment denying the State's motion for summary judgment on the issue of applicability of La. R.S. 9:2795. The State subsequently filed a motion to amend to correct the second judgment to reflect that the defense was urged during trial, not pursuant to a motion for summary judgment. Alternatively, the State moved for a new trial on the denial of the defense and the issue of liability. The trial court amended the judgment to properly reflect that the defense was raised at the trial on the merits, but denied both the motion for new trial on the applicability of the statute and the assessment of fault and damages. This suspensive appeal followed.

DISCUSSION:

A. Improper Reconciliation of Judgments
At the close of the bifurcated trial, the jury rendered a verdict finding liability as follows: 41% to the State, 37% to the Parish, and 22% to Leona Sevin. The trial court took the case against the Parish under advisement. One year later, on January 13, 2004, the trial court rendered its judgment finding no liability on the part of the Parish. The judgment further stated, "[t]herefore, in accordance with law, the percentage of fault apportioned to the Parish of Plaquemines must be reallocated in proportion to the percentages of fault allocated to the State of Louisiana and Leona Sevin." The trial court reapportioned the fault as 65% to the State and 35% to Leona Sevin.
The State argues that it was error for the trial court to reapportion fault because it is the province of the courts of appeal to harmonize conflicting decisions. We agree.
It has long been the rule in this circuit that the proper standard of appellate review in bifurcated trials with inconsistent *622 verdicts is to conduct a de novo review of the record, without according any weight or deference to the factual findings of the judge or jury. McCullough v. Regional Transit Authority, 593 So.2d 731 (La.App. 4 Cir.1992). The first, second and third circuits have adopted a different standard that accords deference to the factual findings of the judge and jury in attempts to harmonize inconsistent results. Thornton v. Moran, 348 So.2d 79 (La.App. 1 Cir.1977); Eppinette v. City of Monroe, 29,366 (La.App. 2 Cir. 6/20/97), 698 So.2d 658; Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3 Cir.1987). These circuits merely decide whether the judge or jury made a more reasonable finding. The Supreme Court has refused writs from the first, third and fourth circuit, and the divergent opinions continue. However, until such time as the Supreme Court rules on the proper standard of review in these types of cases, we are bound by this Court's holding in McCullough, supra.
In the instant case, the trial court attempted to reconcile its findings with that of the jury by reallocating the finding of liability on the part of the Parish. The trial court, after finding the Parish free from liability, simply split the jury's allocation of fault to the Parish proportionately between the State and Leona Sevin. As stated previously, the trial court was without authority to make such a reallocation of fault. Therefore, we vacate the judgment of the trial court, and review the trial court record de novo.

B. De Novo Review:
To prove negligence by the State and/or Parish in this matter, the plaintiffs must prove that the property that caused the damage was in the care, custody and control of the defendant(s); the property was defective because it contained a condition that created an unreasonable risk of harm (defect); the defendant(s) knew or should have known of the defective condition; and, the defect/unreasonably dangerous condition was a cause in fact of the damages. La. Civ.Code art. 2315. Knowledge of the defect by defendants is not an element of proof for strict liability. La. Civ.Code art. 2317.
During discovery, the State admitted that it owned the property, i.e., the Mississippi River water bottom, at the time of this accident. That admission was admitted into evidence at trial. Accordingly, we find no liability on the part of the Parish. We now need to determine if the property owned by the State contained a defect/unreasonable risk of harm, and, if so, whether that defect was a cause-in-fact of plaintiffs' damages. Further, based on the State's admission of ownership, we find no error in the trial court's finding that the Parish was not liable for plaintiffs' damages.

1. Unreasonably dangerous condition/defect:
Louisiana Civil Code art. 2317 imposes strict liability upon one who has custody or control over the thing that causes harm, if that thing has a vice or defect that poses an unreasonable risk of harm. Socorro v. City of New Orleans, 579 So.2d 931, 936 (La.1991); Loescher v. Parr, 324 So.2d 441 (La.1975). Plaintiffs correctly note that questions of liability in an unreasonable risk of harm claim are best left to the trier of fact after a trial on the merits. The determination of whether a particular risk of harm is reasonable is a matter wed to the facts of the case. Celestine v. Union Oil Co. of California, 95-1868 (La.4/10/95), 652 So.2d 1299, 1304. After thoroughly reviewing the facts of this case, we find that plaintiffs have failed to prove that the naturally occurring drop *623 off in the river created an unreasonable risk of harm.
Plaintiffs allege that the lure of the "beach" combined with the severe drop off posed an unreasonable risk of harm of which the State had a duty to warn. Plaintiffs agree with the State that a defect must constitute a dangerous condition or pose an unreasonable risk of harm to a prudent person who exercises ordinary care under the circumstances. However, plaintiffs argue that the Sevins could not have exercised ordinary care and discovered the defect when it was completely hidden. We find that Leona Sevin did not act as a prudent person under ordinary circumstances when she allowed her two small children to venture out into the Mississippi River.
The testimony reveals that Leona Sevin could not swim. All family members testified that she would never go into water where she could not touch the bottom, and that her swimming skills were limited to "dog paddling." This testimony begs the question: If one cannot see the bottom, how can one determine if one can touch the bottom? In other words, Mrs. Sevin allowed her sons to go into the river without knowing if they could touch bottom or if she would be able to help them should they encounter trouble. There was also testimony from an aunt and Harold Sevin, Jr., that the boys could "swim like fish." These opinions were derived from witnessing the boys swim in a swimming pool at swimming lessons. A swimming pool in a controlled situation and the Mississippi River are hardly analogous.
Plaintiffs argue that although drowning may be an obvious risk to someone who elects to go swimming, encountering a hidden and severe drop off is not. Therein lies the flaw in plaintiffs' argument; the drop off did not cause the Sevins to drown, the fact that they could not swim or could not swim very well is the cause of their injuries. If any of them were able to truly swim the fact that they suddenly went into deeper water would not matter. Angela Sevin testified that when a large ship came down the river, her mother made the boys get out of the water. Obviously, Mrs. Sevin was aware that a large ship could only travel in extremely deep water, and that the ship would cause a wake that would make the water rise near the shore. Therefore, plaintiffs cannot argue that Leona Sevin did not know that the water in the river at some point was over her or her sons' heads.
There was testimony that at different times of the year the water level in the river caused the batture to be smaller or larger or completely covered. This would indicate that the drop off was in different spots depending on the water level of the river. Richard Jones, the gentleman who attempted to rescue the Sevins and a resident of the area for over 32 years, testified that he knew the sand deposits in the river would change, causing the drop off to move. On the day of the accident, he too encountered the drop off; however, because he could swim he had no difficulty in the deeper water.
The State cites Johnson v. City of Morgan City, 99-2968 (La.App. 1 Cir. 12/22/00), 787 So.2d 326, for the proposition that unevenness on the bottom of a body of water is a naturally occurring phenomenon, and, therefore, cannot be considered a defect. In Johnson, a young boy drowned in a lake after stepping into a hole in the bottom of the lake. The First Circuit stated that "the existence of a hole in a natural lake, that renders the depth of the lake deeper than other portions, would not, ipso facto, constitute a defective condition." Id. at pp. 5-6, 787 So.2d at 330. Plaintiffs argue that the drop off at the site of this incident and a hole in a *624 lake are somehow different. They contend that the drop off was not merely a hole, but a sudden and severe 10-foot drop off. The combination of the hidden nature of the drop off and the allure of the beach, combined to make the condition encountered by the Sevins unreasonably dangerous. We fail to see the distinction between the hole in Lake Palourde and the drop off in the Mississippi River. Lake Palourde was certainly an alluring swimming spot. Indeed, the lake was developed by Morgan City for recreational use, including water activities such as boating, skiing, sailing, swimming and fishing. The reason the Johnson child drowned was because he stepped into a hole in the lake where the water was over his head. This hole was also described as a drop off by the park manager. As stated above, we do not find that Leona Sevin and her two sons drowned because of a drop off in the river, but rather because they could not swim.
In an attempt to establish that the State was aware of other drownings at the site, plaintiffs called Luke Petrovich, a Plaquemines Parish resident, attorney, and former political player. Mr. Petrovich refused to refer to the area as a beach, but acknowledged that there was a sandbar visible at different times of the year near Fort Jackson. He had witnessed people wading and swimming in the area. When asked if he was familiar with other drownings that had occurred there at the beach, Mr. Petrovich responded, "I know of occasions where persons have drowned around that area." Aside from being inadmissible hearsay, Mr. Petrovich's testimony hardly substantiates that these other alleged drownings happened at the site of this accident, that the persons who allegedly drowned were using the site for recreational purposes, or that the existence of the drop off caused the drownings.
Our courts have consistently held that it is the primary duty of a swimmer or diver to ascertain the safety of such inherently dangerous activities. Socorro, supra at 939, citing Socorro v. City of New Orleans, 561 So.2d 739, 760 (La.App. 4 Cir.1990); Stuart v. City of Morgan City, 504 So.2d 934, 938 (La.App. 1 Cir.1987); Jolivette v. City of Lafayette, 408 So.2d 309 (La.App. 3 Cir.1982); also see St. Hill v. Tabor, 542 So.2d 499 (La.1989). The testimony establishes that Mrs. Sevin could not swim, her two young sons had only recently learned to swim (we note that their level of capability was not established), and that the Sevins had never before entered the water at the accident site, but had only observed others wading and swimming. Based on this testimony, we do not find that the drop off from the batture into the river near Fort Jackson created an unreasonable risk of harm. Rather, we find that the cause of the Sevins' injuries was the imprudent actions of Mrs. Sevin on that tragic day.
Accordingly, we find that the sole cause of the injuries sustained by the Sevins was the negligence of Leona Sevin. The judgment of the trial court is vacated.

DECREE
Having found that the sole cause of the injuries sustained by plaintiffs was the negligence of Leona Sevin,
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the Parish of Plaquemines and the State of Louisiana, and against plaintiffs, Harold Sevin, Sr., Angela Sevin, and Harold Sevin, Jr.
VACATED AND RENDERED.
MURRAY, J., Concurs with Reasons.
McKAY, J., Dissents with Reasons.
*625 MURRAY, J., concurring.
Although I agree with the result the majority reaches, I write separately to articulate my reasons and to address the immunity issue the State strongly urges on appeal.
The State argues that it is immune from liability under the recreational use immunity statutes. More particularly, the State cites La. R.S. 9:2795(E), which provides this immunity applies to water bottoms owned or operated by the Department of Wildlife and Fisheries ("DWF") regardless of the purposes for which the water bottom is used.[1] The State stresses that the Mississippi River water bottom is operated by the DWF, citing La. R.S. 56:3. I agree.
Although this provision relieves the State from establishing that the property was used for a recreational purpose, the jurisprudence has held that the State nonetheless must establish the two other requirements for invoking the immunity; to-wit:(i) that the land upon which the injury occurred is undeveloped, nonresidential, and rural or semi-rural, and (ii) that the injury-causing instrumentality was of the type normally encountered in the "true outdoors" as opposed to a type usually found in someone's back yard. See Deumite v. State, 94-1210 (La.App. 1 Cir. 2/14/97), 692 So.2d 1127. Clearly, the drop off in question satisfies the latter requirement. As to the former requirement, the State stresses that 95% of the 8,000 acres within the two-mile radius of the accident sit is marsh, river batture, borrow pits, and pastures. Given the nature of the surrounding area, I would conclude this requirement is satisfied. I would thus find the State entitled to immunity under the facts of this case.
Regardless, I also find the trial court erred in finding the plaintiffs met their burden of proving the three elements required to recover in strict liability under La. C.C. art. 2317; to-wit: (i) the thing which caused the damage was in the custody of the defendant; (ii) the thing contained a "defect" (i.e., had a condition that created an unreasonable risk of harm to the plaintiff); and (iii) the "defective" condition of the thing caused the plaintiff's injuries. Oster v. Department of Trans. and Dev., 582 So.2d 1285, 1288 (La.1991)(citing Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990)).
The first element is thus not at issue. The State's ownership of the Mississippi River bottom at which the accident occurred is not contested. In finding the second and third elements not met, the majority relies heavily on Ms. Sevin's inability to swim. This fact is relevant only in determining cause in fact (the third element), not in determining whether the drop off presented an unreasonable risk of harm (the second element).
Whether a condition presents an unreasonable risk of harm is a mixed question of law and fact requiring a balancing of policy considerations. Viewed as such, I cannot conclude this drop off located approximately fifty feet from the bank of the Mississippi River presents an unreasonable risk of harm. First, the Mississippi River is a commercial waterway, and this court can take judicial notice of the economic significance of the River to our State's economy. Second, unlike in Soccorro, there are no posted signs along the banks of the River *626 regarding swimming. Third, the condition at issuea drop offis not a manmade one; it is a natural one. Fourth, this condition is not one that can be corrected. Finally, the cost of posting warning signs would be prohibitive. Taken together, these factors warrant a finding in favor of the State that the drop off at issue is not an unreasonable dangerous condition and thus not a defect under La. C.C. art. 2317.
For these reasons, I respectfully concur.
McKAY, J., dissents.
I respectfully dissent from the majority's decision to vacate the judgment of the trial court and render a judgment in favor of the defendants and against the plaintiffs.[1] I fail to see how the majority can reach the conclusion that the State was free from any fault in this case. It is evident, given the number of drownings in the vicinity, that the area of the Mississippi River near Fort Jackson is really not suitable for swimming. It is also evident that people regularly use the area for swimming. The State has at least constructive notice of the prior two statements. Therefore, it appears that the State should have at least posted some sort of warning signs in this area. Accordingly, I believe that the State should have been assigned a percentage of fault in this case.
NOTES
[1] The petition was originally filed in the 19th Judicial District Court, but was transferred to the 25th Judicial District pursuant to the granting of the Parish's Exception of Improper Venue.
[1] This provision regarding the DWF was added by the Legislature in 1986, Absent this provision in Section (E) applying, this statute does not limit the State's liability. See Miller v. State, 572 So.2d 197, 201 (La.App. 1st Cir. 1990) (citing Monteville v. Terrebonne Parish Consol. Gov't, 567 So.2d 1097 (La.1990)); see also Soccorro v. City of New Orleans, 579 So.2d 931, 944 (La.1991).
[1] In the instant case, it appears that Judge Row attempted to harmonize his finding that there was no liability on the part of Plaquemines Parish with the jury's apportionment of fault. Regarding the proper standard of appellate review in bifurcated trials with inconsistent verdicts, I believe that this Court should consider en banc whether McCullough v. Regional Transit Authority, 593 So.2d 731 (La.App. 4 Cir. 1992) should be overruled. I believe that the First, Second, and Third Circuits follow a more prudent course according deference to the factual findings of the judge and jury in an attempt to harmonize the results. See Thornton v. Moran, 348 So.2d 79 (La.App. 1 Cir.1977); Eppinette v. City of Monroe, 29,366 (La.App. 2 Cir.6/20/97), 698 So.2d 658; and Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3 Cir.1987).